STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. WESTERN UNION TELEGRAPH COMPANY, AND CHARLES H. FRAKE, DEFENDANTS-APPELLANTS.

Argued April 27, 1953—Decided June 1, 1953.

See also 13 *N. J. Super.* 172, 80 *A.* 2d 342.

472

474 

Mr. *Thomas J. Brogan* argued the cause for appellants. (*Messrs. Smith, James and Mathias,* attorneys; *Mr. John H. Waters* (of the New York Bar), general attorney, The Western Union Telegraph Co.; *Mr. William G. H. Acheson* (of the New York Bar), assistant general attorney, The Western Union Telegraph Co.; *Mr. Joseph Weintraub* and *Mr. Adrian M. Foley, Jr.,* on the brief).

*Mr. Joseph A. Murphy*, Assistant Deputy Attorney-General, argued the cause for the State (*Mr. Theodore D. Parsons*, Attorney-General of New Jersey and *Mr. Simon L. Fisch*, Deputy Attorney-General, attorneys; *Mr. Edward J. McCardell, Jr.*, Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

WACHENFELD, J. The Western Union Telegraph Company and Frake, its manager, were indicted and convicted of operating a common-law disorderly house in Cumberland County. The indictment arose out of the sending by the defendants of messages from Bridgeton to one Donaldson in Passaic County and to C. J. Rich & Company in Illinois and the payment in Bridgeton of money wired there by Donaldson and Rich & Company. The messages out of Bridgeton related to wagers on horse races and the money orders transmitted sums of money to the addressees for that purpose. The money orders back to Bridgeton represented the winnings less the charges made.

The State proceeded upon the theory that a disorderly house was proved by showing the defendants habitually received and transmitted at the Bridgeton office bets on horse races through the medium of telegraphic money orders and messages and payment at the office of the winnings on the bets less telegraphic charges.

The prosecutor of the county testified he initiated an investigation concerning the operations of the defendant company and in June 1948, at his direction, a State Police detective went to the Bridgeton office, prepared a horse bet on a regular telegraphic blank addressed to J. W. Donaldson, State of New Jersey. When he handed the bet to an employee, she altered the form of the message, telling the detective it would be cheaper and it would be understood in the revised cryptic form since that was the way they sent all such business. The horse on which the bet was made won and the detective returned the next day to collect his winnings.

As a result, the prosecutor sent for the manager and advised him the company had been taking horse bets for quite some time and it amounted to ordinary bookmaking, in violation of the law. Shortly thereafter, at a conference of the various representatives of the company, the prosecutor testified he told them they were carrying on an illegal business at the Bridgeton office which amounted to bookmaking.

One of the company's agents argued that the company was required to take these telegrams, and a discussion ensued. The prosecutor, according to his version, finally warned them that as far as he was concerned they were engaged in illegal activities, insisted it stop, and said he would hold them responsible.

The company's representatives, however, testified the prosecutor declined to specify or discuss the illegality of the transaction, saying he did not know what statute was violated and therefore could not cite any, but he would write to the Attorney-General for an opinion and it would probably take a few months for a reply.

There was also testimony that the Western Union could continue its existing practices until the prosecutor received an opinion from the Attorney-General, and the suggestion was made that the company have an opportunity to confer further before any action was taken by the State if it turned out the Attorney-General's opinion was adverse to Western Union's position.

Following this conference and the warning alleged by the prosecutor, individuals continued to place bets at the same office on many occasions, and in the afternoon on one of the days on which these transactions occurred, the Deputy Attorney-General and a lieutenant of the State Police entered with search warrants. They seized and impounded those messages referring to horse race bets. This occurred seven months after the conference above referred to.

The acts constituting the unlawful practice which occurred at the Bridgeton office of the Western Union were described by a great many witnesses. In fact, the course of conduct ascribed to it seems not to be denied. One witness testified

she went there to bet on horses and told the girl behind the counter: "I want to play horses—bet on the horses." Another one identified 59 telegrams as her bets and pay-offs, while a third identified 99 bets and pay-off messages, including "parlays and round robins."

A man credited his knowledge as to the way and manner of betting to the information received at the defendants' Bridgeton office showing him how to express his bets on telegraphic forms, including parlays and daily double bets. He identified 91 telegraphic messages as his, while another man who frequently bet several hundred dollars on a race identified 70 telegrams representing some of his transactions. Another witness played every day, many times placing two or three bets in one day. He identified 106 telegrams expressing his views on the horses. Another daily player identified 261 telegrams as his contribution.

Often there would be 20 to 25 people in the office sending telegrams to Donaldson. Racing forms were lying around the office, and the employees of the defendant would help customers in sending out their betting messages and money orders, advising them how it should be done. Approximately 8,000 money orders issued out of the Bridgeton office to Donaldson and Rich & Company during the six months from November 1949 to the raid in April 1950. They showed a total sum bet of $103,466.98, with total telegraphic charges of $11,119.51.

The State's case was abundantly supported by many witnesses, and much of the testimony was not denied. It indicated betting was habitually carried on with the conscious participation of the company in the illegal transactions and its facilities were employed in large-scale gaming business which was financially profitable.

The investigation resulted in the return by the grand jury of five indictments, only one of which we are concerned with here, to wit, the keeping of a common-law disorderly house.

The defendants were also indicted for a violation of *R. S.* 2:135-3, aiding and abetting bookmakers and keeping a statutory disorderly house; violation of *R. S.* 2:119-1, con-

spiring to make book; violation of *R. S.* 2:119–1 by a like conspiracy; and violation of *R. S.* 2:171–3, knowingly carrying messages in aid of an illegal purpose.

Western Union contended the theory adopted by the State would constitute a direct and prohibitive burden upon interstate commerce. It proved it was the sole telegraphic system serving the entire country and had been in existence for 100 years, transmitting messages since 1851 and money orders since 1867; it had 15 reperforator switching centers in the United States through which all messages were automatically relayed. The Philadelphia center handled an area which included New Jersey, and all messages originating in New Jersey for delivery anywhere within or outside of the State passed on wire from the transmitting office to Philadelphia, whence they were routed by a push-button system to offices of destination.

Western Union offered proof tending to show that the imposition of the responsibility attempted to be placed upon it would frustrate the service because it could not find employees with necessary legal knowledge to apply all the laws of the State relating to criminal and unlawful activities. Even if this were possible, the time consumed in performing this function would multiply the number of employees and agents needed, and the necessary element of speed would be destroyed in analyzing the messages, and other difficulties would occur.

It sought to demonstrate the difference between its ease of compliance where a state law definitely and specifically prohibits taking betting messages as opposed to compliance here, where it was contended the company would be required to make a decision construing the applicable statutes on every transaction indulged in.

The jury returned a verdict of guilty and the defendants appealed, the cause being certified here on our own motion.

## I.

The appellants argue that the concept of a disorderly house as applied in this case violates the Constitution of the State

and of the United States. · They approach this subject under the following subdivisions: (a) freedoms of speech and· press; (b) conflict with commerce clause; and (c) denial of due process of law.

a.

The State charged the Western Union's Bridgeton office with being a disorderly house because it habitually accepted and transmitted and profited from the sending of betting messages in violation of the laws of the State. The company suggests that this concept would not be limited to violation of gambling laws but would necessarily apply as well if the messages accomplished a violation by the sender or ·recipient of any law which denounces any particular conduct as criminal or civilly unlawful.

Western Union in its brief reasons: "* * * to avoid the criminal liability here sought to be imposed Western Union would have to analyze the meaning of every telegram, determine its legality and the intentions of the parties to the communication. Clearly this would be censorship." It asserts: "Under the present point we are concerned with the invasion of the basic freedoms which this concept would accomplish. * * * We contend that the challenged concept operates to impose a *previous restraint* upon the exercise of the freedom of speech and press." And further: "In dealing with the issue of censorship with respect to United States mail our Federal courts have expressed the repugnance of censorship to our constitutional provisions and our Federal policy."

We have difficulty in recognizing the applicability of the reasoning advanced and the authorities cited to the pending issues. The record discloses no encroachment upon the doctrine of freedom of speech as no effort was made by the appellants to utter a single word or express a thought on any topic of public interest or concern. Their only activity was to transmit for a fee messages in violation of the state law on gambling and to permit sizeable groups of men and women constantly to congregate upon their premises to

place their wagers on horses and collect their winnings when they were successful. All this despite the warning by the authorities that what they were doing was unlawful and amounted to bookmaking.

■ We are fully cognizant there must be no trespass upon the pathways established by the Bill of Rights and the Constitution protecting the right of free speech and a free press; but we see no infringement here upon the doctrines enunciated that "there must be room for the unorthodox as well as the orthodox views." *U. S. v. Rumely,* 345 *U. S.* 41, 73 *S. Ct.* 543, 551 (1953).

In *City of Louisville v. Wehmhoff,* 116 *Ky.* 812, 76 *S. W.* 876, 885 (*Ct. App.* 1903), rehearing denied 79 *S. W.* 201 (*Ct. App.* 1904), a similar issue as presented here was encountered. It was contended the defendant had no discretionary power with respect to furnishing service and that it must render indiscriminately an impersonal and impartial service to all the public. The court brusquely disposed of the matter, saying:

"The telegraph company, whether or not it has a conscience, has a duty. It is claimed that this duty is only to serve the public. Not so. Its first duty is to obey the laws, just like other people. The public cannot demand a service which in and of itself involves a violation of the law."

The sovereignty of the state would indeed be a mockery if the rule were otherwise and it lacked the power to compel its citizens to obey its laws.

In *Howard Sports Daily v. Weller,* 179 *Md.* 355, 18 *A. 2d* 210 (*Ct. App.* 1941), it was held the telegraph company had the right to refuse service which was connected with illegal operations. Otherwise, the court decided, the telegraph companies would be converted into public vehicles for the consummation of illegal acts prohibited by state laws. *Smith v. Western Union Telegraph Co.,* 84 *Ky.* 664, 2 *S. W.* 483 (*Ct. App.* 1887); *Western Union Telegraph Co. v. State,* 165 *Ind.* 492, 76 *N. E.* 100, 3 *L. R. A., N. S.,* 153 (*Sup. Ct.* 1905); *Bryant v. Western Union Telegraph Co.,* 17 *F.* 825 (*C. C. Ky.* 1883).

The right of telegraph and telephone companies to refuse service where it promotes illegality has been determined many times. *Cullen v. N. Y. Tel. Co.*, 106 *App. Div.* 250, 94 *N. Y. S.* 290 (*App. Div.* 1905); *Application of Manfredonio*, 183 *Misc.* 770, 52 *N. Y. S. 2d* 392 (*Sup. Ct.* 1944); *Dente v. N. Y. Tel. Co.*, 55 *N. Y. S. 2d* 688 (*Sup. Ct.* 1944); *Tela. News Flash v. District Atty.*, 197 *Misc.* 1015, 96 *N. Y. S. 2d* 338 (*Sup. Ct.* 1950); *Movietime, Inc., v. N. Y. Tel. Co.*, 277 *App. Div.* 1057, 101 *N. Y. S. 2d* 71 (*App. Div.* 1950).

No one is under a legal duty nor can one be compelled by law to commit, foster or aid in the commission of a crime, and so, too, a telegraph company is under no obligation nor can it be forced to accept messages for transmission which would subject it to criminal prosecutions either as principal or as an accessory; nor is one under an obligation to accept messages for transmission which are purely gambling messages, for to do so would be contrary to law, good morals and public policy. *Bryant v. Western Union Tel. Co., supra; Smith v. Western Union Tel. Co., supra; City of Louisville v. Wehmhoff, supra; Western Union Tel. Co. v. State, supra.* Jones, *Telegraph & Telephone Companies* (*2d ed.* 1916), § 273, *p.* 383 & § 426, *p.* 557.

The messages in the case *sub judice* on their face clearly were gambling messages, horse race bets, and nothing more. They had no news value and contained no public information. There was no attempted disguise or pretext. The import of the transaction was fully within the knowledge of the individuals and the defendants, who consciously and with full awareness not only transmitted the messages but aided and materially assisted in the composition and direction of them so that the customers' wagers could be successfully consummated.

b.

As to the application of the concept of disorderly house violating the Commerce Clause of the United States Constitution because it placed an undue burden on interstate com-

merce, the appellants contend all commerce involved here is interstate because all messages passed through Philadelphia pursuant to a system of communication adopted in good faith and without intent to evade the jurisdiction of the State of New Jersey and the operations are so "inextricably intertwined" that regulatory power may not be divided. They argue the State, in the exercise of its police powers, may not so interfere with the interstate commerce as to impose an undue burden upon it.

The argument thus presented is disposed of in *McCarter v. Hudson County Water Co.*, 70 *N. J. Eq.* 695 (*E. & A.* 1905), affirmed 209 *U. S.* 349, 28 *S. Ct.* 529, 52 *L. Ed.* 828 (1908). There a statute made it unlawful to abstract water from lakes of the State and transport it through pipes or conduits into any other state. Dealing with the Commerce Clause objection, the court said:

"The state having power to prohibit the diversion of the water from the lakes and streams for transportation beyond the state, the prohibition is a condition imposed upon its diversion, and so the water diverted cannot legitimately enter into interstate commerce."

The same theory applies in the instant case. Inasmuch as horse race bets are illegal and unlawful in New Jersey, they cannot legitimately be classified as interstate commerce. Consequently such commerce is in no way affected or involved.

In *Ames v. Kirby*, 71 *N. J. L.* 442 (*Sup. Ct.* 1904), horse race bet messages and money orders were received at the Atlantic City office of the telegraph company, which transmitted the messages and money orders by telegraph to a corporation in West Virginia. Ames, acting for the telegraph company at its office in Atlantic City, received and transmitted the messages and money orders whereby bets were made on horse races in West Virginia. He, as did the defendants here, contended there was a violation of the Commerce Clause of the Federal Constitution, but the court said:

"In the case before us the so-called commerce has no existence except such as may arise through an infraction of the local law against gambling. Traffic that has such an origin cannot be legitimate interstate commerce. The local prohibition attaches before any commerce commences."

A similar claim was made in *City of Louisville v. Wehmhoff, supra* [116 *Ky.* 812, 79 *S. W.* 202], the court saying:

"The carrier wants us to say that its part in this unlawful partnership to violate the moral and statute laws of a community is protected by the federal constitution. As was said by one of the courts, the Constitution, at most, gives the Congress exclusive jurisdiction to regulate interstate commerce, not interstate crime. * * * But wagering bets on horse races cannot be an article of commerce, no more than could be a lottery business. Both are *per se* immoral and deleterious to society, and clearly within the power of the states to prohibit. It could never have been contemplated by the framers of the federal Constitution that the hands of the states were to be tied so that they could not protect themselves from such vices if one of the participants chanced to use an interstate vehicle of commerce for carrying on the business."

If any doubt remains, it is dispelled by the testimony of Mr. Lambert, Chief of the Telegraph Division of the Federal Communications Commission, a member of the F. C. C. staff since 1935, who said there were no regulations of the F. C. C. which would require Western Union to accept or transmit wager messages or wager money orders in the State of New Jersey.

c.

It is also contended that the standard employed by the trial court was so vague and uninformative as to be a denial of due process of law, in violation of *Article* I, *paragraph* 20, of the State Constitution and of the 14th Amendment of the Federal Constitution. It is urged there was no practical way by which Western Union or its employees could, prior to the acceptance of a message and transmission, measure the conduct of its patrons against a standard which is at once so "sweeping and so nebulous," and as the company is subject to both criminal and civil liability for refusing

to take a message it must carry, it "could not choose to do nothing. It had to act." Hence, the company, it says, was placed in a dilemma by the application of this concept of a disorderly house, and the "imposition of criminal liability in these circumstances is arbitrary and beyond the police power of the State."

We think not.

■ Service without discrimination does not require a telegraph company to abet criminals or to aid those who continuously break our state laws. No one is compelled to aid an unlawful undertaking, and Western Union was not forced to send horse race bets over its telegraphic lines. A public utility has not only a right but a duty to refuse service for criminal purposes. *Andrews v. Chesapeake & P. T. Co.*, 83 *F. Supp.* 966 (*U. S. D. C.* 1949); *Hamilton v. Western Union*, 34 *F. Supp.* 928 (*U. S. D. C.* 1940).

The employees of the company here were told by the bettors what they wanted to do, to wit, bet on horse races, and the employees suggested and instructed them how to accomplish this purpose, how to word the messages, and even where to direct them. They had full knowledge of the entire transactions and their import.

The company had specifically been warned of the illegality of the activities indulged in, but despite the admonition emanating from constituted authority, the practices were continued without abatement. The Due Process Clause was not intended to give immunity or protection under these circumstances.

## II.

*R. S.* 2:103–1 provides:

"* * * all other offenses of an indictable nature at common law, and not expressly provided for by statute, shall be misdemeanors."

The appellants contend this clause cannot be invoked because the common-law crime here relied upon was super-

seded by statute. It is not intended, they contend, that there should exist side by side both a common-law and a statutory proscription of the same conduct, pointing out that the following three statutes supersede the alleged common-law offenses:

(1) *R. S.* 2:156–2 declares: "Every building or place where the law is habitually violated is hereby declared to be a nuisance," and *R. S.* 2:156–3 provides that any person who maintains such nuisance shall be guilty of a misdemeanor;

(2) *R. S.* 2:135–3 provides that any person who keeps a place to which persons may resort for gambling in any form shall be guilty of a misdemeanor; and

(3) *R. S.* 2:171–3 expressly deals with the liability of telegraph companies with respect to carrying messages.

█ Before a statute supersedes the common law, there must be some express or specific statement to that effect.

██ "When the common law and a statute differ, the common law gives place to the statute, only where the latter is couched in negative terms, or where its matter is so clearly repugnant that it necessarily implies a negative. (Citation.) It is a rule of exposi-tion that statutes are to be construed in reference to the principles of the common law, for it is not to be presumed that the legislature intended to make any innovation upon the common law further .than the case absolutely required. The law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced, for if the parliament had had that design, it is naturally said they would have expressed it." *State v. Norton*, 23 *N. J. L.* 33 (*Sup. Ct.* 1850).

The rule is followed in *State v. Loog*, 13 *N. J. Misc.* 536 (*Sup. Ct.* 1935), where it is held unless negative or exclusive words are used or an expression specifically abolishing the common law, such will not be its interpretation. Affirmed on the opinion below in *State v. Henry*, 117 *N. J. L.* 442 (*E. & A.* 1937).

In *State v. Berman*, 120 *N. J. L.* 381 (*Sup. Ct.* 1938), the court said:

"While we find no definition of a disorderly house at common law, nor in our statute, yet under the cases in our state any

house which a jury finds to be open to and frequented by persons who so conduct themselves there as to violate law and good order may be a disorderly house. *Russell on Crime* (*9th ed.*) 1381; *State. v. Williams*, 30 *N. J. L.* 102; *Brown v. State*, 49 *Id.* 61; *Bindernagle v. State*, 60 *Id.* 307."

██ The acknowledgment of the existence of both the statutory and common-law offense and the distinction between the two was dwelt upon by this court in the recent case of *State v. Costa*, 11 *N. J.* 239 (1953), where Mr. Justice Brennan said:

"It is true that the statutory offense requires proof of an additional ingredient not necessary to be shown upon an indictment for keeping a disorderly house. The common law offense is established when it is proved that the defendant permitted his place to be used by persons whose conduct to his knowledge rendered the place disorderly, whatever his intent may have been. Proof of the statutory offense, however, must reach beyond, to his intent, and support the inference that the defendant intended that persons should resort to the place for the purpose of gambling. *State v. Ackerman*, 62 *N. J. L.* 456 (*Sup. Ct.* 1898); *State. v. Griffin*, 85 *N. J. L.* 613 (*E. & A.* 1914); *State v. Terry*, 91 *N. J. L.* 539 (*E. & A.* 1918), *reversing* 89 *N. J. L.* 522 (*Sup. Ct.* 1916) * * *."

## III.

It is next contended there was no evidence that the Bridgeton office was a disorderly house and that the court erred in its treatment of the issue. Under one heading the appellants submit sundry matters, including denial of motions for judgment which they say should have been granted, errors in rulings, the court's charge, and its refusal to charge as requested. The following is a synopsis of the points made: (a) the activities alleged could not constitute the telegraphic office a disorderly house; (b) the court erred in charging *R. S.* 2:57–1 and in refusing to charge Requests 10 and 11; (c) there was no betting, bookmaking or gambling; (d) the case of *Ames v. Kirby, supra,* does not apply; (e) there was no evidence to bring the case within the definition of a common-law disorderly house; (f) there was no proof of one of the essential ingredients of the alleged crime; (g) the

essential element of guilty knowledge was absent; and (h) the court erred in refusing to charge a large number of requests.

Some of the appellants' points will not be mentioned separately, although they have all been considered. Where not specifically disposed of, we have concluded they do not possess such semblance of substance as to require observation.

As we have already pointed out, the State proceeded upon the theory that the defendants permitted persons to come together on their premises for the express purpose of engaging in betting, bookmaking and gambling, and these unlawful practices, habitually carried on, constituted the common-law offense of keeping a disorderly house.

In addition to the textbook definitions of the offense, it is defined in *State v. Ackerman*, 62 *N. J. L.* 456 (*Sup. Ct.* 1898):

"The fact that he keeps a house which, to his knowledge, is rendered disorderly by the conduct of those whom he permits to frequent it, is the gist of the misdemeanor and will constitute guilt, whatever his intent may be."

In *State v. Moore*, 75 *N. J. L.* 619 (*E. & A.* 1907), writ of error dismissed 223 *U. S.* 709, 32 *S. Ct.* 519, 56 *L. Ed.* 623 (1911), the court held:

"It was manifestly an indictment for maintaining a disorderly house. The specific mention of the acts of gaming carried on in that house was to exhibit the maintenance of an illegal act or series of acts therein, which, when habitual, impressed upon the place the character of a nuisance. A disorderly house may result from maintaining a place wherein any of the practices mentioned in the indictment—tippling, fighting or gaming—are permitted to be carried on. As the testimony developed on the trial of the indictment, the misdemeanor could have been charged in the indictment or in a count in the indictment under section 65 of the Criminal Procedure act, but none the less the habitual use of a house for gaming, as for any other illegal practice, constitutes a disorderly house at common law."

See *Haring v. State*, 51 *N. J. L.* 386 (*Sup. Ct.* 1889); *McClean v. State*, 49 *N. J. L.* 471 (*E. & A.* 1887).

 We think the State proved a disorderly house as alleged in the indictment and that the testimony, much of it not even denied, clearly brought the appellants within it.

*Ames v. Kirby, supra,* despite the appellants' objection, seems to be both applicable and controlling. The telegraph company there, a Virginia corporation authorized to do business in New Jersey, was empowered to receive and transmit messages and money by telegraph. It was so engaged and at its office in Atlantic City habitually received and transmitted by telegraph messages and money orders which were bets upon horse races made in West Virginia. The indictment alleged the company kept a place where persons might resort for betting on horses without the State of New Jersey, contrary to *section* 65 of the *Crimes Act.* It was argued there, as here, that the betting transaction was not shown to have been completed in the state, but the court said:

"Every wagering contract requires two parties. Each of these parties is engaged in betting. If twenty persons resort to a place in this state to engage in betting, the mischief to them and to the community, when they all bet against some absent party with the aid of the telegraph or telephone, is precisely the same as if the twenty were betting amongst themselves. The evils attendant upon such a resort are not mitigated by concealing the bookmaker or poolseller, nor by placing him at a distant point either within or without the state. The place of resort is a gambling place and the keeper of it is plainly within the condemnation of section 65."

The case is followed in *State v. Frank,* 90 *N. J. L.* 78 (*Sup. Ct.* 1917).

In *State v. Morano,* 134 *N. J. L.* 295 (*E. & A.* 1946), bookmaking was said to be:

"* * * the making of a book of bets—i. e., the making or taking and recording or registering of bets or wagers on races and kindred contests; and the particular statutory provision has ever since denounced the making or taking of a book on horse races only. * * * Prior to the constitutional amendment of 1939, our law against gambling was all embrasive, and is now except as to wagers made at pari-mutuel race tracks; and the design of the provision against bookmaking is, not only to punish such violators, but also to prevent violations by others, and thus to enforce the general anti-gaming policy."

Although the indictment alleged "betting, bookmaking and gambling," the court charged, and it is not controverted, that the State need prove only one of these. It defined gambling as "the act of risking or staking anything on an uncertain event."

If there is any uncertainty as to the practice indulged in by the many customers constituting bookmaking or participation therein, their conduct seems clearly to come within the definition of gambling as defined by the trial judge. The appellants assert gambling is a generic term with no particular significance, meaning nothing more than a specific charge of betting or bookmaking. We are not in accord with the thought so expressed as we subscribe to the definition pronounced by the judge below.

As to guilty knowledge, the appellants urge the crime charged here is based on the common law and it is fundamental that every common-law crime requires proof of a *mens rea*. Without quarreling with this thought, we think the court's charge fully covered it. The charge given is described by the appellants as "disjointed and contradictory." We do not join in this appraisal. We have studied it with considerable care and think it clearly and correctly defined the pertinent law and with equal clarity gave a resume of the conflicting facts and circumstances involved without infringing upon the prerogatives reserved to the jury. As to knowledge, it charged:

"* * * it is for you to say whether the defendant corporation knowingly and willfully permitted it, and whether the defendant, Frake, operated it or conducted it knowingly. * * * Knowledge by the corporate proprietor of a house of illegal practices carried on therein is necessary to convict it of keeping a disorderly house, and mere negligence, while evidential of the fact of knowledge, is not its legal equivalent, but its knowledge may be inferred as a matter of fact from evidence showing a course of practice, or frequent acts, of which, in the natural order of things, it would have been cognizant and to which its assent would be as a matter of fact naturally implied."

The court charged *R. S.* 2:57–1, and it is objected to because it is not a criminal statute and was not violated by an offer to bet or instructions to bet. The statute provided:

"All wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event, shall be unlawful."

It was pertinent to the legal status of wagers and bets and was properly charged. As to whether or not it was violated was properly left to the jury for its determination.

There was a large number of requests to charge, 71 in all. The denial of many is cited as error. In each instance the court gave the reason for its failure to comply and the situations are classified as follows: already charged; inaccurate statement of law; unwarranted conclusions; abstract principles not precise and extra of the issue; not including all circumstances; not applicable and erroneous conclusions.

We have studied the requests and the rulings in detail as they relate to the law and the case and agree with the disposition made by the trial judge.

## IV.

It is said there was no evidence of knowledge as to the defendant Frake and the court erred as to both defendants in charging as it did and refusing to charge as requested on the issues of illegality of the wagers and the defendants' knowledge thereof.

As to the telegraphic messages, the appellants in their brief say: "They did relate to betting. Hence the jury was instructed in effect that messages relating to betting offended the criminal law. The court did not require a finding that the bets were unlawful where the contract of betting came into being. This was plain error."

We cannot agree. We think the messages relating to betting offended our criminal law as the court charged.

The appellants assert that the charge on "knowledge" was wholly uninformative and that the court erred in denying

the motion of Frake for judgment by reason of the absence of proof as to his knowledge.

We have already commented upon the charge, as related to the question of knowledge, and see no necessity for further analysis. As to the factual situation, Frake was present while most of the activities complained of were going on. He sometimes waited upon the customers himself, and it is conceded that the messages contained only horses' names and the way in which the wager was made.

Knowledge of the operation of a disorderly house may be brought to the accused by evidence showing a course of conduct from which it may be inferred. *State v. Beavers*, 89 *N. J. L.* 370 (*E. & A.* 1916); *State v. Ensberg*, 94 *N. J. L.* 464 (*E. & A.* 1920).

In a six months' period there were 8,000 money orders transmitted accredited to Bridgeton, while in a like period throughout the entire State there were 132,103. Bridgeton, on the basis of population, accounted for six per cent of the total number of money orders throughout the State while its population was not quite four-tenths of one per cent of the total population of the State.

With transactions of this magnitude, plus the other evidence in the case, it seems almost naive to suggest that Frake did not have knowledge of what was going on. As a matter of fact, at the oral argument counsel conceded it, saying the appellants "knew what they were doing."

There was no necessity for the State to show the appellants kept the place for the purpose of having people come there for illegal conduct. It was sufficient if they permitted or suffered the illegal practices to continue with knowledge of their existence. *State v. Williams*, 30 *N. J. L.* 102 (*Sup. Ct.* 1862).

## V.

Excluding proof of good faith and advice of counsel it is said was error, as were the charge and the refusal to charge in reference thereto.

Testimony of the company's retired general counsel was offered to prove that in 1943 his staff examined the laws of all states and gave an opinion that New Jersey had no statute prohibiting the transmission of these money orders or messages. It was offered, it is stressed, to "prove the fact of advice." The appellants reason: "We do not contend that advice of counsel constitutes a separate defense so that if the jury finds that advice was given it must thereby acquit. Rather we contend that a criminal mind is essential to the State's case and any fact which bears upon the existence of that criminal mind is a fact that must be considered."

The record discloses the offered testimony was in substance the legal advice of counsel and would amount to representations as to the law. Here the State assumed and undertook proof of knowledge and the court, as we have already observed, charged in reference to it, saying: "Knowledge * * * of illegal practices carried on * * * is necessary to convict * * * and mere negligence is not its legal equivalent. * * *" The inquiry is therefore whether under these circumstances the proffered testimony should have been admitted.

A like problem was presented with respect to the Federal Communications Commission license, and the court charged: "* * * the license granted to it by the Federal Communications Commission cannot throw a cloak of immunity over its actions if in fact they are violative of the laws of the State of New Jersey." Similarly it charged as to the challenged evidence: "I charge you that these were legal instructions and were not representations as to fact and furnish no excuse to a person for an alleged violation of the law and therefore they cannot be relied upon as a defense in this case. I further charge you that neither ignorance of the law, nor the fact that in the act complained of an accused acted on the advice of counsel, will relieve from liability."

This is sound law and in accord with our adjudications. In *State v. Pruser*, 127 *N. J. L.* 97 (*Sup. Ct.* 1941), the following from 1 *Wharton on Criminal Law* (12th ed. 1932), was quoted with approval:

"As, however, it is a postulate of penal laws that they should be obeyed, it is a condition of those laws that ignorance of them should be no defense to an indictment for the violation."

A contrary doctrine would spell chaos and an impossibility of law enforcement. . If ignorance is no defense, then legal advice that the law was not applicable or effective falls into a similar category and is likewise unavailable to exculpate the defendants. We see no error.

## VI.

The appellants argue there was error in submitting to the jury the question of whether bookmaking or gambling occurred on the premises of the Western Union at its Bridgeton office, upon the ground there was no evidence to support a finding on that issue.

This is repetitious and has already been dealt with. We said there was an abundance of evidence, much of it not even denied, warranting the course adopted by the trial court. We have also said even if there was uncertainty as to the practice habitually indulged in by the appellants' many customers constituting bookmaking or participation therein, their conduct clearly came within the definition of gambling as defined by the court. We see nothing new to consider by the argument here presented.

## VII.

It is claimed there was error in the court's charge on aiding and abetting as it was utterly foreign to the proof and the indictment and, further, the definition of aiding and abetting was erroneous.

Frake could not be harmed by it because it did not mention him. It was limited entirely to the corporate defendant and it followed a dissertation on the activities and conduct of Frake illustrating that an isolated incident would not be sufficient to fasten upon him responsibility but "continued and habitual" occurrences would be.

In this regard the court pointed out if the "corporation knowingly and willfully permitted it," referring to Frake's conduct, the jury could take cognizance of it.

■■ The distinction between principal and accomplice or aider and abettor has been abolished in our jurisdiction for purposes of indictment and punishment. *State v. Cooper,* 10 *N. J.* 532 (1952). We see nothing prejudicial in this respect warranting relief.

## VIII.

Next it is said there was no evidence that Frake was a keeper; the verdict was against the weight of the evidence, and the court erred in its charge and its refusal to charge on this subject.

Briefly, the argument seems to be that Frake's duties were precisely the same as those of the three female employees, and like all other employees he was bound by the large volume of printed instructions and the various directives issued to the field. In short, he was just an employee without any semblance of discretion or control despite the empty title of manager, reliance being placed upon *Engeman v. State,* 54 *N. J. L.* 257 (*Sup. Ct.* 1892); *Bindernagle v. State,* 60 *N. J. L.* 307 (*Sup. Ct.* 1897); *State v. Harrington,* 87 *N. J. L.* 713 (*E. & A.* 1915), holding "if it was beyond his control" there would be a defense.

■ Merely because an employer tells an employee to commit a crime does not exonerate the employee in the eyes of the law. He need not obey such a command and if he does, he is answerable to the authorities in the event his conduct violates a statute prohibiting it.

Frake was the manager and in charge of the Bridgeton office and we think his responsibility was clear.

## IX.

The court below, it is claimed, committed numerous errors, each of which merits reversal, which in sum amounted to a denial of a fair trial. In their brief the appellants say: "We

here urge numerous errors as grounds for reversal and also contend that in the sum the errors and events herein discussed operate to deny a fair trial in violation of due process of law guaranteed by the federal and state constitutions. * * * The printed word is here. The attitude of the court, the emphasis, hostilities and inflections are not. * * * We believe the responsibility lies with the trial judge."

### 1.

First it is said after the defense concluded the opening statement, the court inquired of defense counsel: "Do I understand that you admit for your client, Frake, that he conveyed or took and conveyed via telegraph messages which contained bets on horses? Do you deny that or admit it?" One counsel curtly replied: "I entered a not guilty plea." The other, when inquired of, replied: "I have nothing to say. The whole business is so bizarre and absurd. The State brought this case so let him prove his case."

"The Court: That is your answer?

"Counsel: Yes.

"The Court: We will now recess."

Counsel then moved for a mistrial by reason of the action of the trial court as outlined above, contending: "The net effect of the question propounded by the court is to call on the defendants to admit to part of the State's case and, in fact, a very vital part because of the various ramifications that part entails, or to refuse that part of the State's case, which refusal would prejudice the jury of the position of the defense when the defendants put their case into evidence." The court denied the motion, commenting: "Certainly the court in the performance of his duties is not only entitled but I conceive is under an obligation to clarify the issues." He then charged the jury:

"Ladies and gentlemen of the jury: Immediately prior to the recess a question was asked or questions were asked by the court, directed to Mr. Howell, who represents the defendant, Frake, and to Judge Brogan, who is one of the counsel for Western Union.

The jury is instructed to disregard and eliminate from their minds the conversation that ensued and we will proceed with the trial."

When counsel's attitude was stated, the court not only pursued the inquiry no further, but even charged the jury to disregard it. We find no authority under these circumstances justifying the granting of a mistrial.

*State v. Craig*, 9 *N. J. Super.* 18 (*App. Div.* 1950), holds the opposite for which it is cited. In an expression *obiter dictum* the court implied, in view of *Rule* 2:7–3, it was better practice for the court to refrain from interrogating or requesting defendant or his counsel to make known his defense during the trial. Yet it found no error in the principal question presented. Here, when counsel evinced no desire to cooperate in the clarification sought, the judge immediately instructed the jury to disregard and eliminate the incident, and we see nothing indicating the appellants suffered manifest wrong or injury.

## 2.

Throughout the trial, say the appellants, the court minimized efforts of the defense by characterizing offers of proof as a claim of "immunity" to violate the law. "The trial court repeatedly interrupted with queries to the defense as to whether it contended that the Prosecutor could 'grant immunity' and repeatedly instructed the jury during the trial that no such immunity could arise. * * * Thus the efforts of the defense * * * were pauperized by the trial judge and in effect the defendants were charged with injecting a frivolous issue into the case."

We have read the testimony of every incident referred to in the briefs and find no "specific objection thereto was made," as required by *Rule* 1:2–19(a), or that the defendants made known their "objection to the action of the court and the grounds therefor," as required by *Rule* 2:12–7. These matters do not come within the exception stated in *Rule* 1:2–19(a), nor do we find there "appears from the

entire record of the proceedings had upon the trial that the defendant thereby suffered manifest wrong or injury."

In many instances the record shows complete accord of the defendants' counsel with the court's utterances and rulings:

"The Court: I don't think you can inquire into the operations of the Prosecutor in writing letters to the Attorney General. The strict issue in this case is: will the State be able to prove the allegations under the indictment if they constitute a crime in the State of New Jersey. That is the issue. You admit as the Prosecutor he can't clothe a defendant corporate or individual with immunity.

Mr. Brogan: That is as true as anything you have ever said, Judge.

The Court: Thank you very much."

And again:

"Q. Nor did you ever say to them you are keeping a disorderly house? A. No, sir, I didn't.

The Court: Suppose he didn't. Does that preclude the Prosecutor or the State?

Mr. Howell: No, it does not, your Honor."

Under our rules there is nothing before us to determine.

### 3.

Again, it is said the court unreasonably restricted the defense throughout the trial. Examples are the refusal to permit cross examination as to why Stanger had done nothing in the two-year period which intervened between Trooper Hunt's message of June 1948 and the raid of April 26, 1950; and why he did not close down Western Union's operations in September 1949.

■ Stanger was asked: "Will you explain to us why you didn't then and there shut down Western Union?" The prosecutor's objection to this question was sustained, and we think properly so. The defendants made known their dissatisfaction with the court's ruling in this isolated instance, but otherwise the record reveals no specific objection to the

rulings of the court on these points, in compliance with *Rule* 1:2–19(*a*) and *Rule* 2:12–7. Furthermore, we do not think the matters complained of constitute "plain errors affecting substantial rights of the defendant," excusing the absence of an objection. *Rule* 1:2–19(*a*).

### 4.

When the witness Stamler was on the stand the prosecutor asked him if in making the raid he had with him "a search warrant from the Honorable David L. Horuvitz, Judge of this court." The appellants urge this was an effort made to have the jury infer that the trial judge had thus indicated the defendants' guilt. A motion for a mistrial was denied and cited as error.

The record shows when counsel made the statement that a search warrant, when issued, was not in the slightest degree evidence of guilt, the court immediately concurred, saying: "I say to the jury neither a search warrant nor an indictment is evidence of any guilt," and repeated it:

> "I want to state to the jury again that the issuance of a search warrant is no evidence of guilt nor is an indictment. If there is any intimation in the jury's mind that the fact that I signed the search warrant indicates guilt, disabuse your minds of it. I have made my position clear to the jury.
> "Mr. Weintraub: You have made your position clear, yes."

How counsel can now contend there was error in refusing to grant a mistrial under these circumstances is beyond us and hardly warrants further comment.

### 5.

Criticism is directed to the court's excluding testimony, its allowance of cross-examination, and the alleged confusion created thereby as it pertained to the witness Stark..

The principal difficulty encountered was centered on the following question: "What was the report, the advice, which you gave to Western Union with reference to its duty in the

matter?" It was objected to by the prosecutor and there ensued many pages of colloquy and argument. The court finally recessed to consider briefs submitted by the defendants and returned some hours after to rule upon the question ·and continue the case. The objection made was sustained.

The appellants are dissatisfied because "the net result was that the jury was left with a confused impression that the defendants had violated a host of statutes," and "The result certainly was the placing of undue emphasis upon the denial of the validity of the position of the defense."

 We are not prepared to say our judicial determination would have paralleled the trial court's in its control of the cross-examination referred to, but a wide discretion is always allowed in the conduct of a trial and the record here bespeaks of no abuse entitling the appellants to the relief sought.

### 6.

Referring to the defense of undue burden upon interstate commerce, it is said: "The court's treatment of the issue reflects preconceptions as to the case," and the court erroneously assumed and implied to the jury that "immunity" to violate the state law was the appellants' defense.

The matters presented here practically repeat the complaints made under Points I(b) and IX(2) and require no further observation.

### 8.

The State issued subpoenas directing some witnesses to appear before a grand jury when it was not in session, and when the witnesses answered, they were sworn privately and examined. The testimony thus taken was used at the trial to "refresh" the memories of these witnesses.

Appellants assert the testimony thus secured was obtained by an abuse of process and that such testimony should be suppressed as the sole effective remedy against the abuse or the facts be submitted to a jury for its consideration as to

what testimony should be believed. The court concluded it was interested only in the question of "voluntariness" and the appellants say: "Even on this issue the court refused to permit examination which would bear upon the voluntariness."

This is not so. The court ruled:

"But in this particular instance I shall not preclude the defense from showing on cross examination, if they can, or at least going into the question of whether there was any promise of reward or whether the witness was in fear or whether there was any coercion or duress exercised. Certainly all that can be gone into on cross examination.

I think the question of the subpoena is not a matter that I am going to let you inquire into. I think it is an attempt to attack the subpoena collaterally, which cannot be done in this trial."

No effort thereafter was made to embrace the opportunity given by the court to show the testimony was coerced and not voluntary. Counsel refused to ask whether the answers were voluntary but insisted upon inquiring whether the witnesses "voluntarily appeared."

██ The quality of the testimony given under these circumstances should be determined by the standard prescribed by the court, but the appellants chose not to evaluate it on that basis. Not a case nor an authority is cited in support of the appellants' view. If it was true, voluntary, and uncoerced, we know of no reason why it should not have been admitted. It should not be inferred, however, that the procedure criticized has our tacit approval. We are merely deciding the testimony so secured could not be nullified by the collateral attack made.

## 9.

The prosecution, it is said, insisted on "asking questions which incorporated the unproved postulates that Donaldson was a bookmaker, that the bets were made at Bridgeton, and that the messages constituted the completed bet."

There was continuous and constant argument throughout the trial on this subject and the court finally said: "No, I am not going to have any more argument about this. This is too fundamental a question and I think we are quibbling with words."

 The appellants allege the jury could infer from this that "the defense was captiously protracting the trial with 'quibbling.'" If the jury arrived at such a conclusion, it would find some support in the record, but it could not fairly be attributed to the comment of the trial court. We see no manifest wrong or injury suffered by the appellants in this respect.

### 10.

At the conclusion of the charge the court asked objections to it be recorded. There were about 71 exceptions referring to the failure to charge as requested, and when these were completed, the court left the bench and directed counsel to complete the record in his absence. Thereafter counsel continued with about five more pages of exceptions and contend: "Thus the court did not even listen to the objections, much less consider them."

The appellants' position is rather all-inclusive. The complaint is that the judge was not there when he should have been and then again when he was there he did not do what he should have done.

 No reason is presented nor an authority cited showing how the appellants were prejudiced or harmed, and the absence of the court while the objections were being noted on the record did not affect their net worth on appeal.

### 11 and 12.

 At the close of the prosecutor's summation, the defense registered objections to the State's argument and asked for instructions to the jury that certain portions should be disregarded and it alleged other statements made by the

prosecutor were "deliberate efforts to place the blame of a protracted trial upon the defendants."

Viewed in light of the trial court's charge, we do not think they constituted grounds for reversal. See *State v. Grillo*, 11 *N. J.* 173 (1952); *State v. Tansimore*, 3 *N. J.* 516 (1950); *State v. Continental Purchasing Co.*, 119 *N. J. L.* 257 (*Sup. Ct.* 1938), affirmed 121 *N. J. L.* 76 (*E. & A.* 1938); *State v. Hauptmann*, 115 *N. J. L.* 412 (*E. & A.* 1935), *certiorari* denied 296 *U. S.* 649, 56 *S. Ct.* 310, 80 *L. Ed.* 461 (1935).

### 13.

The trial court here, it is charged, "refused to listen to argument." The frequency and length of the many arguments made and indulged in, the repetitious insistence of counsel, and the entire record indicate to the contrary. We think the suggested reflection is unwarranted.

### 14.

It is urged error was committed because what the court said "gave the jury the false impression that Western Union could be convicted only if Frake was convicted."

In the very next paragraph the appellants' brief quickly concedes: "A very careful reading of the court's charge might be said to free it of this manifest error. * * *" But the complaint is it was doubtful if the jury, listening to the rapidly read charge, could make so careful an analysis of it, contending the court should "have been obliged to clarify his charge."

In this respect the court charged:

"You may find both defendants guilty as charged, or you may find both defendants not guilty, or you may find one defendant guilty and the other not guilty. Separate verdicts must be returned as to each defendant."

How it could have more lucidly been said is beyond our comprehension.

15.

Under Point III the appellants said the court's charge was "disjointed and contradictory." It is now said to be "utterly vague and indefinite. * * * It could only confuse."

No particular clause, statement or portion of the charge is complained of or singled out. It is simply condemned as a whole without the assignment of a reason other than the conclusion already mentioned. The appellants are content with the argument that the trial court should have rendered a charge which was "direct, explicit and clear."

We have already given our appraisal of the court's charge, and a re-examination of it brings us to the same conclusion. It is full, fair and adequate and embodies every legal obligation consistent with established judicial practice and tradition. Furthermore, it gave the defendants all the protection to which the law entitled them.

Our examination of the entire record fails to disclose that the appellants suffered manifest wrong or injury.

The judgments below are accordingly affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.