**UNITED STATES of America,**
**Plaintiff**

v.

**Austin J. TOBIN, Defendant.**
**Cr. No. 986–60.**

United States District Court
District of Columbia,
Criminal Division.

June 15, 1961.

William Hitz, Asst. U. S. Atty., and John C. Keeney, Attorney, Department of Justice, with whom Oliver Gasch, U. S. Atty., at the time of argument, was on the brief, for plaintiff.

Roger Robb, Washington, D. C., and Sidney Goldstein, General Counsel, The Port of New York Authority, New York City, pro hac vice by special leave of court, with whom Daniel B. Goldberg, Rosaleen C. Skehan, Joseph Lesser, Isobel E. Muirhead, and Michael Zarin, New York City, were on the brief, for defendant.

David D. Furman, Atty. Gen., State of New Jersey, Burrell Ives Humphreys, Dept. Atty. Gen. State of New Jersey, Daniel M. Cohen, Asst. Atty. Gen., State of New York, each pro hac vice by special leave of court, with whom Louis J. Lefkowitz, Atty. Gen., State of New York, was on the brief, amici curiæ by special leave of court for States of New Jersey and New York.

Woodson D. Scott, Attorney for the New York Chamber of Commerce, pro hac vice by special leave of court (Harry A. Inman, Washington, D. C., of counsel) amicus curiæ.

Richard W. Ervin, Atty. Gen., State of Florida, filed a brief on behalf of that State and other States, as amici curiæ by special leave of court.*

---

* These States and the names of their respective Attorneys General who joined in Mr. Ervin's brief are: Mr. MacDonald Gallion, Alabama; Mr. Duke W. Dunbar, Colorado; Mr. Januar D. Bove, Jr., Delaware; Mr. Eugene Cook, Georgia; Mr.

YOUNGDAHL, District Judge.

This is a contempt of Congress prosecution against Austin J. Tobin, Executive Director of the Port of New York Authority.[1] The Authority is an agency established by the States of New Jersey and New York pursuant to Congressionally-approved interstate compacts.

The charge is brought by the Government under 2 U.S.C.A. § 192, which provides that one

> "who having been summoned as a witness by the authority of either House of Congress * * * to produce papers * * * willfully * * refuses to [produce papers] pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor * * *."

Prosecution followed defendant's citation for contempt by the House of Representatives and subsequent certification of the citation by the Speaker of the House to the United States Attorney for the District of Columbia.[2]

The alleged contempt was Mr. Tobin's refusal to produce certain Authority documents and memoranda subpoenaed by Subcommittee number 5[3] of the House Judiciary Committee[4] in connection with its investigation of the Authority during the second session of the 86th Congress. Mr. Tobin is, in his own words, "in complete charge of all files of the port authority, both * * * the official records and the internal records."[5]

Pursuant to the subpoena Mr. Tobin did produce Authority by-laws, organization manuals, rules and regulations, annual financial reports, and minutes of meetings of its Board of Commissioners.[6]

However, he did not produce certain internal documents, including financial and management reports, agenda of meetings, staff reports, and other communications relevant to dealings and policies of the Authority in the fields of construction, insurance, public relations, real estate, revenue bonds, and rail transpor-

Shiro Kashiwa, Hawaii; Mr. Edwin K. Steers, Indiana; Mr. Jack P. F. Gremillion, Louisiana; Mr. Frank E. Hancock, Maine; Mr. Joe T. Patterson, Mississippi; Mr. Clarence A. H. Meyer, Nebraska; Mr. Roger D. Foley, Nevada; Mr. T. W. Bruton, North Carolina; Mr. Leslie R. Burgum, North Dakota; Mr. Mark McElroy, Ohio; Mr. Daniel R. McLeod, South Carolina; Mr. George F. McCanless, Tennessee; Mr. Will Wilson, Texas; Mr. Walter L. Budge, Utah; Mr. Thomas B. Debevoise, Vermont; and Mr. John W. Reynolds, Wisconsin.

1. The case was tried to the Court without a jury. Motions were made by the defendant, both at the conclusion of the Government's case and at the conclusion of the trial, for judgment of acquittal. The Court reserved decision on these motions and took the case under advisement.

2. See 2 U.S.C.A. § 194, and note 54, *infra.* The charge was brought through an information, Mr. Tobin having waived his right to Grand Jury presentment and prosecution by indictment, and having joined with other high officials of the Port Authority in stipulating that: "upon entry of a final judgment of conviction against defendant Tobin herein,

the Port Authority will produce upon the request of said subcommittee all of the papers demanded in said subpoena duces tecum and held by the court to be pertinent to the matter under inquiry by said subcommittee. In furtherance of the intent of this paragraph, the Port Authority hereby agrees forthwith to initiate and to pursue all proceedings necessary to effect final ratification of this paragraph."

3. Hereinafter referred to as the "Subcommittee" or the "committee."

4. Hereinafter referred to as the "Committee."

5. H.Rep. No. 2117, 86th Cong., 2d Sess. (Report citing Austin J. Tobin) Appendix I p. 33 [hereinafter referred to as "June 29 Tr."].

 Although two other Authority officials were also subpoenaed to produce the same documents, and cited by the House for failing to produce them, only Mr. Tobin's failure has been made the subject of a prosecution under 2 U.S.C.A. § 192.

6. He also furnished nonsubpoenaed material and made an apparently unqualified offer to answer on oral examination any questions about the Authority.

tation.[7] It is his refusal to produce these documents that resulted in this prosecution.

## Introduction

A. *Historical Background.*[8] Early in this century numerous groups and individuals urged that rapid and efficient handling of commerce flowing through the bi-state area surrounding New York City could be accomplished only by treating the region as a single entity and by creating a bi-state agency to promote this end. Thus prompted, the New York and New Jersey legislatures, in 1921 and 1922, ratified compacts creating the Authority and specifying its initial functions.[9] Congressional approval was given pursuant to Article 1, Section 10 of the Constitution.[10]

The Authority is headed by Commissioners appointed in equal number from each compacting State, and its day-to-day operations are conducted by a staff selected by the Commissioners. Mr. Tobin, as Executive Director, is the highest ranking staff member.

The Authority has the right to own and operate terminal and transportation facilities and related property within a delineated port district, and the responsibility of making recommendations to the two States' legislatures for improving or adding to existing projects. These recommendations can become effective only through identical legislation in the two States; by a similar process the two States can expand the port district's boundaries.[11] Further, the Authority has power to raise funds through sale

---

7. As reproduced in the information, the subpoena's call for the documents was divided into four categories. Those in brackets were produced; the others were not:

 (1) [all by-laws, organization manuals, rules and regulations;]

 (2) [Annual financial reports;] internal financial reports, including budgetary analyses, post-closing trial balances, and internal audits; and management and financial reports prepared by outside consultants;

 (3) All agenda [and minutes] of meetings of the Board of Commissioners and of its committees; all reports to the Commissioners by members of the executive staff;

 (4) All communications in the files of the Port Authority and in the files of any of its officers or employees including correspondence, inter-office and other memoranda and reports relating to:

 (a) the negotiation, execution and performance of construction contracts; negotiation, execution and performance of insurance contracts, policies and arrangements; and negotiation, execution and performance of public relations contracts, policies and arrangements;

 (b) the acquisition, transfer and leasing of real estate;

 (c) the negotiation and issuance of revenue bonds;

 (d) the policies of the Authority with respect to the development of rail transportation.

A subsequent letter from the Subcommittee to Mr. Tobin advised that "production * * * of all documents described in that subpoena dating from January 1, 1946 to June 15, 1960 [would] be full compliance with the subpoena." June 29 Tr. 32.

8. Additional background may be found in Commissioner of Internal Revenue v. Shamberg's Estate, 2 Cir., 1944, 144 F. 2d 998, 1000–1002, certiorari denied 1945, 323 U.S. 792, 65 S.Ct. 433, 89 L. Ed. 631; Bush Terminal Co. v. City of New York, 1934, 152 Misc. 144, 273 N.Y.S. 331, 335–337, and the factual material included in the brief filed on behalf of Mr. Tobin, pp. 8–18 (hereinafter referred to as "Br.").

9. The 1921 document was the "compact" establishing the Authority and delineating its powers and duties; the 1922 document was the "comprehensive plan" for *its initial operations.* For purposes of this case the two documents are referred to as the "compacts," and the Congressional resolutions approving them—42 Stat. 174 and 42 Stat. 822—as the "compact resolutions." For their text see also June 29 Tr. 5–13.

10. "No State shall, without the Consent of Congress, * * * enter into any Agreement or Compact with another State * * *."

11. The Authority is also required to make annual reports to the two legislatures.

of bonds to the public,[12] to appear before various Federal and State bodies on behalf of port commercial operation, and to "intervene in any proceeding affecting the commerce of the port." [13]

The compact also allows each State to grant its Governor the right to veto any action taken by its Commissioners. While both Governors have been granted this power,[14] vetoes are rare; discussions between the Authority staff and Commissioners on the one hand and the Governors and their Authority liaison representatives on the other, produce agreement on the kinds of projects the Governors will approve.[15]

Though originally established to aid solution of the port area's freight transportation difficulties,[16] the Authority subsequently has been granted additional powers to construct and maintain facilities for the conduct of passenger movement by car, rail, boat, bus, and plane. Thus at the time of its 1959 Annual Report it was operating

> "twenty-one terminal and transportation facilities; six inter-state bridges and tunnels; four air terminals and a heliport; six marine terminal areas; two union motor truck terminals; a motor truck terminal for rail freight; and a union bus terminal." [17]

The Authority's investment in these facilities is nearing one billion dollars and its gross operating revenue exceeds $100,000,000 annually. Legislation is presently pending in New York and New Jersey which would empower the Authority to construct and operate a $355,000,000 World Trade Center.

In addition, representatives of the Authority appear before Congress and other Federal bodies on behalf of the Port of New York, and promote the Port through five domestic and four foreign offices and other projects and activities.

Although power to control the Authority's day-to-day operations is thus placed in the Commissioners, the staff and the compacting States, Congress, in approving the compacts, included three principal reservations. First, no "right or jurisdiction of the United States in and over" the area within the port district is impaired.

Second,

> "No bridges, tunnnels, or other structures shall be built across, under, or in any of the waters of the United States, and no change shall be made in the navigable capacity or condition of any such waters, until the plans therefor have been approved by the Chief of Engineers and the Secretary of War."

Third, Congress retained "the right to alter, amend, or repeal" the resolutions of approval to the compacts. In addition, the 1921 compact, as passed by

---

12. Power to pledge the credit of either State without its legislature's consent is denied to it. 1921 compact Art. 7.

13. Id. Art. 13.

14. Each State has exercised this option by empowering its Governor to veto, within ten days of forwarding to him minutes of an Authority meeting, any action of his State's Commissioners reported therein. Since every Authority action must be concurred in by the unvetoed action of a majority of Commissioners from each State, the veto power gives each Governor, in effect, the ability to prevent any Authority action.

15. Official Verbatim Transcript, Inquiry into the Activities and Operations of Port of New York Authority Under the Interstate Compacts Approved by Congress in 1921 and 1922, Hearings in New York City, November 28, 1960—December 2, 1960, pp. 520–25 (hereinafter referred to as "Nov.-Dec. Tr.").

Additional potential ability for the compacting States to check on Authority operation is found in legislation giving the appropriate budgetary official of each State the right to audit Authority operations.

16. See, e. g. the 1922 comprehensive plan and 61 Cong.Rec. 4920–21 (1921) (remarks of Congressman Ansorge, which also indicate that at that time, over one half of the nation's foreign commerce passed yearly through the Port of New York.)

17. Defendant's Exhibit No. 2, p. v.

the States, provides that Authority rules and regulations are to be

"not inconsistent with the Constitution of the United States * * * and subject to the exercise of the power of Congress, for the improvement of the conduct of navigation and commerce." [18]

Until this investigation, manifestations of Federal interest in the Authority had been sporadic and principally directed to specific operations. The Army Corps of Engineers had examined bridge and tunnel construction proposals and investigated, several times, the reasonableness of Authority toll charges; the Federal Aviation Agency had exercised continuing control over flights in and out of Authority-operated airports; and Congress had granted Federal funds for construction at these airports and had investigated at least one series of plane crashes involving Newark Airport. In addition, in 1952 another subcommittee of the House Judiciary Committee conducted two days of hearings on a resolution [19] which would have withdrawn Congressional consent from the compacts until amendments could be attached to them. These hearings ended in an adverse Committee report on the resolution after members had attacked it as "not completely followed through" [20] and unwise.

The present investigation, and the subpoena here at issue, are thus not part of continuing Congressional supervision over the Authority. Rather, this is the first time Congress has attempted to gain an over-all picture of Authority operations, and the first time the subpoena power has been employed in connection with any Congressional inquiry regarding the Authority.

B. *Chronology of the Present Investigation.* The spark which set off the inquiry was an announcement by the Authority in December, 1959, that it favored construction of a jet airport in Morris County, New Jersey. Because this location is apparently outside the present boundaries of the port district, and for other reasons not here relevant, this announcement caused considerable concern among New Jersey's Congressional representation about the Authority and its operations. As a result, sometime in February, 1960, a delegation purporting to represent the unanimous sentiment of the full New Jersey group requested the Chairman of the House Judiciary Committee to initiate a study of the Port Authority.[21]

Following this request, the Chairman proposed a joint resolution [22] which would have amended the Port Authority compact resolutions to (a) require advance Congressional approval of any legislation by the two States "amending or supplementing" the compacts; (b) require submission to Congress of all periodic reports made by the Authority to the two States; and (c) permit Congressional committees to (1) demand disclosure of any information deemed relevant, (2) inspect any books, records, and papers requested, and (3) view any Authority facility.

At about the same time, the Chairman directed the Judiciary Committee staff "to make a study of the activities and operations of the authority under the

18. Art. 18.

19. H.J.Res. 375, 82nd Cong., 2d sess. (1952).

20. Hearings on H.J.Res. 375 Before a Special Subcommittee of the Judiciary Committee of the House of Representatives, Official Verbatim Transcript, May 14, 21, 1952, pp. 7–8, 10 (remarks of Chairman Celler), 48–49 (remarks of Congressman [now Senator] Keating).

21. 106 Cong.Rec. 16063 (daily ed. August 23, 1960) (remarks of Congressman Celler); Id. 16066 (remarks of Congressman Cahill).

22. H.J.Res. 615, 86th Cong., 2d Sess. (1960). [Govt.Ex. No. 6]. The resolution also would have re-enacted the present compact resolution provisions reserving to Congress "the right to alter, amend or repeal" the resolutions.

1921 and 1922 compacts, including a review of the scope of the authority's major operations." [23] Shortly thereafter, the Chairman wrote to Mr. Tobin informing him of the Committee's purposes and requesting him to permit Committee investigators to inspect certain enumerated files and records located at the Authority's New York headquarters.[24] The investigators journeyed to New York but, by the Authority's own admission, were permitted to see only documents which were matters of public record. They were told that the other requested materials were being withheld pending decision by the Authority Commissioners "after consultation with either or both of the Governors of New York or New Jersey." [25] However, the documents were not produced.

The next significant step in this chronology occurred on June 1, 1960, when the House of Representatives, on the recommendation of its Rules Committee and at the request of the Judiciary Committee Chairman and ranking minority member, unanimously resolved to grant the Judiciary Committee subpoena power in connection with matters "involving the activities and operations of interstate compacts." [26]

Thereafter, on June 8, 1960, Subcommittee 5 of the Judiciary Committee formally voted an inquiry of the New York Port Authority. On that same day, the Subcommittee informed Mr. Tobin and the Authority of its decision and stated:

"The purpose of the inquiry is to determine whether pending or other legislation is necessary in respect to the interstate compacts creating the * * * Authority. For that reason the subcommittee will inquire into the organization, structure, and activities of the * * * Authority

to ascertain (1) whether or not it has exceeded the scope of its activities as contemplated by Congress in approving the interstate compacts of 1921 and 1922; and (2) the extent to which the authority is carrying out its duties and responsibilities under these interstate compacts." [27]

The Subcommittee indicated it would send two members of its staff to the Authority's New York headquarters on June 15, and it requested that the Authority make available certain specified documents. These were the documents later called for in the subpoena.

On June 10, Mr. Tobin replied.[28] He detailed the material which the Authority had already furnished and stated that because the Authority was a "state agency" and because the subpoenaed documents related "solely to the internal administration" of the Authority, they never could assist in any valid purpose of the committee and were not pertinent to its stated purpose. He added that an investigation of the type proposed would inhibit use by the States of the interstate compact device, and closed with an expression of hope that the June 15 meeting between the Authority and committee staffs could result in agreement as to any future production of documents.

On June 13, the Chairman answered that the Subcommittee had considered carefully and rejected these objections, and he directed that the demanded documents be furnished as requested on the 15th.[29] At the conclusion of the meeting on the 15th, which was devoted principally to a restatement of the previously developed positions, Mr. Tobin was served with the subpoena requiring him to produce the enumerated documents when the committee met in Washington on June 29.

23. June 29 Tr. 2 (remarks of Chairman Celler).

24. Id. 14.

25. Id. 15 (letter from Chairman Celler to Mr. Tobin, reporting his understanding of the conversation at the Authority's headquarters).

26. H.Res. 530, 86th Cong.2d Sess., amending H.Res. 27, 86th Cong.1st Sess. Id. 13–14, 106 Cong.Record 11593–11594.

27. June 29 Tr. 15–16.

28. Id. 16–19.

29. Id. 20.

Several days later, the Governors of the two States wired the Chairman expressing concern over what they asserted to be grave questions of constitutional principle involved in the investigation, and requesting postponement of the return date until they could meet with the committee. This request was rejected on assurance that all objections had been considered and that representatives of the Authority would be given further chance to raise them on June 29th. On receipt of this rejection, the Governors sent identical letters [30] to their representatives on the Board of Commissioners "instruct[ing]" them to "direct" Mr. Tobin not to comply with the subpoena. The Governors indicated that their

> "only purpose [for ordering noncompliance] is to insure that these basic questions of constitutional propriety and legality will be fully considered and determined by the appropriate tribunal."

On June 27 the Port Authority Board of Commissioners, at a specially-called meeting, "directed" Mr. Tobin to comply with the Governors' instructions as set forth in the two letters.[31]

Finally, on June 29, the Subcommittee met to receive the return of the subpoena.

Following preliminary statements by the Chairman and Committee counsel, Mr. Tobin was ordered to produce the subpoenaed documents. He did not comply, relying on all the reasons he had theretofore given, including the Governors' letter, the lack of pertinency of the documents, and the general immunity of "State agency" documents from Congressional demand. The Chairman then ruled Mr. Tobin in default.[32]

The hearing concluded with statements by the Attorneys General of the two States and the Authority General Counsel. Subsequently the Subcommittee voted to report to the full Judiciary Committee a resolution citing Mr. Tobin for contempt; the full Committee voted to report the alleged contempt to the House of Representatives; and, after efforts failed to arrange a meeting between the two Governors and the Subcommittee, the House voted to cite Mr. Tobin for criminal prosecution.[33]

Thereafter, in the week of November 28, 1960, the Subcommittee, over the Authority's objection, held hearings in New York City in pursuance of the investigation. Although resolution of the factual issues posed by this case depends principally on the events of June 29 and the months preceding, the transcript of these later hearings [34] was received in evidence for any light which they might shed on disputed questions raised by the earlier events.

To this prosecution Mr. Tobin has raised numerous defenses. They fall, in the Court's view into five categories:

I. The Subcommittee was not authorized to conduct an investigation in which it could call for the documents here at issue.

II. The subject matter of the inquiry and the pertinency of the documents was not sufficiently established or made clear to him.[35]

III. The committee had no proper legislative purpose in conducting the inquiry.

IV. The documents called for were privileged and immune from Congressional demand.

V. He cannot be found guilty of contempt of Congress because his action was compelled by orders from his "superiors," the two Governors.

For reasons which the Court will now state, each of these defenses is rejected,

---

30. Id. 39–40.

31. Defendant's Ex. No. 5.

32. June 29 Tr. 54–55.

33. 106 Cong.Record 16059–94 (daily ed., August 23, 1960).

34. See note 14, *supra.*

35. The defense of "excessive breadth" of the subpoena, which was argued at trial as though a separate issue, is subsumed in the Court's present analysis as an ingredient of the pertinency defense.

and the Court finds Mr. Tobin guilty of the offense charged.[36]

## I. *The Subcommittee's Authorization*

A Congressional committee cannot legally exercise the investigative power of its parent body unless it is the recipient of that power through proper delegation.[37] Thus it is a requirement in a contempt of Congress prosecution that the committee's authorization be proven to conduct the investigation or issue the subpoena in question.[38]

Because it is important that the interests of groups and individuals outside Congress not be subjected to unauthorized committee action, courts in contempt prosecutions have, in effect, imposed a requirement for clearly stated authorization by construing vague or ambiguous authorizations narrowly.[39]

This judicial requirement for unquestioned authorization also has as its purpose in some cases the avoidance of unnecessary constitutional adjudication; for by construing a vague resolution narrowly, courts avoid the risk of passing on the constitutionality of committee action which Congress may never have intended to authorize. In this way they refrain from making far-reaching constitutional pronouncements that "would affect not an evanescent policy of Congress, but its power to inform itself, which underlies its policy-making function."[40] Such avoidance also gives Congress the opportunity to consider with "full awareness of what is at stake"[41] what responsibilities it will delegate to a committee, and has the additional effect of preventing unnecessary disharmony between the legislative and judicial branches.[42] On the other hand, if Congress has given clear authorization for committee action, it must be presumed willing that the action be submitted to any legal challenge that may ensue.

At the outset, the Court notes that the Reorganization Act of 1946, which distributes functions among Congressional committees, assigns to the Judiciary Committee jurisdiction over "interstate compacts generally."[43] While it is true that the other committees of the House have been given jurisdiction over certain specific compacts, exclusive jurisdiction

---

36. Mr. Tobin also contended that the documents demanded by the subpoena were not identified with sufficient particularity and that his acquittal was mandated unless the Court held the Subcommittee "entitled to each and every document withheld." The former defense was not open to him because he did not raise it, as required, before the committee, see *infra* note 94, and the latter defense is not reached in this case in view of the Court's finding that the Government has proved, for the reasons stated *infra* note 60, that all demanded documents were pertinent to the committee's stated subject.

37. United States v. Rumely, 1953, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770; Watkins v. United States, 1957, 354 U.S. 178, 200–201, 77 S.Ct. 1173, 1 L.Ed.2d 1273; Brewster v. United States, 1958, 103 U.S. App.D.C. 147, 149, 255 F.2d 899, 901.
 For reasons of "simple procedural efficiency" and with consideration for the separation of powers principle, however, courts will not entertain contentions that a committee is acting illegally until the parent house in question has attempted, through citation for contempt, *to impose* sanctions upon an individual for refusal to comply with a committee's order to answer questions or supply subpoenaed material. Pauling v. Eastland, D.C.Cir. 1960, 288 F.2d 126, 129.

38. Barenblatt v. United States, 1959, 360 U.S. 109, 116–123, 79 S.Ct. 1081, 3 L.Ed. 2d 1115.

39. Watkins v. United States, supra, 354 U.S. at pages 198–206, 77 S.Ct. at pages 1184–1189. United States v. Peck, D.C. D.C.1957, 154 F.Supp. 603, 606, 611.

40. United States v. Rumely, supra, 345 U.S. at page 46, 73 S.Ct. at page 546.

41. Id. See generally, Bickel and Wellington, "Legislative Purpose and the Judicial Process: The Lincoln Mills Case," 71 Harv.L.Rev. 1, 27–35, 38–39 (1957).

42. Bickel and Wellington, supra, at 34–35.

43. 60 Stat. 827, Rule XI, § (1) (L) 18 of the Standing Rules of the House of Representatives.

over the Port Authority compacts has traditionally been in the Judiciary Committee.[44]

■ Therefore, the question posed here is whether, having this jurisdiction, this Committee was authorized to conduct an investigation into the substantive operations of the Authority of depth sufficient to permit requests for documents of the type called for by this subpoena. The answer to this question is to be found in an examination of the resolution, passed by the House on June 1, 1960, granting to the Committee authorization "to conduct full and complete investigations and studies relating to * * * the activities and operations of interstate compacts," using the subpoena power, if necessary.[45]

Defendant contends that this resolution should be read to permit inquiry only into "those aspects of an interstate compact agency which are peculiar to its interstate compact status." [46] The Court assumes, *arguendo*, that so read, the resolution would not authorize the Committee to probe as deeply as it did, and the constitutional issue of whether Congress has power to secure "internal documents" of a compact agency would be avoided.

However, it is clear to the Court from the language, context, and floor discussion preceding passage of the June 1 resolution that it authorized an investigation of much greater depth than defendant argues. First, the resolution itself is unqualified; it speaks of "full and complete investigations and studies relating to * * * the activities and operations of interstate compacts."

Second, the resolution was introduced by the Chairman of the Judiciary Committee on May 17, 1960,[47] shortly after the Committee had failed in its efforts to obtain non-public Authority documents through informal means.[48]

Third, during the short floor discussion on June 1, several significant statements were made. Congressman Brown of the Rules Committee, which had recommended passage of the resolution, stated:

> "I have been assured by both the ranking member of the [Judiciary] Committee on our [Republican] side and by the Chairman * * * that the committee does not expect to use or abuse this power through a great many investigations but, instead, go look into one particular State's compact [sic] where, under present laws and under the compact, there is no control or knowledge of just how a great many public funds are being expended. * * * [T]he Commit-

44. It was the House committee which considered and recommended passage of the 1921 and 1922 compacts, and which considered the resolution, supra note 19, which would have withdrawn Congressional consent from the compacts until they could be further amended.

45. Supra note 26. When the Court refers to the "June 1st resolution," it intends to include as well reference to the basic resolution that was amended on that date, H.Res. 27, 86th Cong., 1st Sess.

H.Res. 27 granted to the Judiciary Committee the power "to conduct full and complete investigations and studies," using the subpoena power where necessary, relating to several of the areas assigned to the jurisdiction of the Committee by the Reorganization Act of 1946. H.Res. 530, the resolution actually passed on June 1, added the area of "the activities and operations of interstate compacts."

Congress' authorization to the full Judiciary Committee here discussed was also its authorization to Subcommittee number 5; for it was stipulated at trial that whatever power the full Committee received, it properly delegated to the Subcommittee.

46. Br. 95.

47. 106 Cong.Record 10483.

48. These informal efforts were part of the preliminary Committee study, by the staff of the full Committee, referred to in the Introduction. Since the Court is here concerned only with the authorization for the investigation voted by Subcommittee number 5 on June 8, 1960, it need not and does not decide whether this preliminary, informal study was authorized under the Committee's general jurisdiction over the Port Authority compacts.

tee on Rules has had explained to it the need for this investigation and the good that can come from it." [49] Later in the debate the Chairman of the Rules Committee stated that the Judiciary Committee was "given blanket authority to investigate" [50] in connection with those interstate compacts coming within its jurisdiction.[51] At no point in the history of the resolution was any limitation on this "blanket authority" suggested.

The Authority contends, however, that Congress could not have intended to authorize the Judiciary Committee to inquire into areas of Authority activity that affect Federal interests normally within the legislative purview of other House committees.

This argument is not persuasive. There is no doubt that the diverse and extensive operations of the Authority cut across a great many areas of Federal concern. Precisely because this is so, it is not unreasonable to assume that both for purposes of internal efficiency and to prevent undue burdens on the Authority, Congress might focus its visitatorial powers with respect to the Authority in a single committee.[52]

The Court finds, therefore, that it was the clear import of the June first resolution that the Judiciary Committee be authorized to conduct an investigation that could encompass a request for the subpoenaed documents here at issue.[53]

## II. *Subject Matter of the Inquiry and Pertinency of the Documents*

■ The Court assumes, *arguendo*, that the contempt of Congress statute imposes a requirement that before a person who stands in default may be convicted, the Government must establish that a request for documents, no less than questions propounded at a hearing, be pertinent to the subject matter under investigation.[54] The Supreme Court has made it clear, in addition, that when a person is called by a legislative committee to give information, he must be given a clear explanation of the subject matter under inquiry and the pertinency of the request for information to that subject.[55] Since a witness "must decide at the time the questions are propounded whether or not to answer," [56] fundamental fairness requires that he be given information upon which to make this decision that is as explicit and clear as

---

49. 106 Cong.Rec. 11593.

50. Id. 11594.

51. i. e. It did not entitle the Committee to investigate "interstate oil compacts," which Rule XI, § (1) (K) 6 assigns to the jurisdiction of the Committee on Interstate and Foreign Commerce, or "interstate compacts relating to apportionment of waters for irrigation purposes," which Rule XI, § (1) (n) 9 assigns to the Committee on Public Lands. See 106 Cong.Record 11594.

52. cf. United States v. O'Connor, D.C.D.C. 1955, 135 F.Supp. 590, 595, reversed on other grounds 1956, 99 U.S.App.D.C. 373, 240 F.2d 404; 92 Cong.Record 10043 (remarks of Congressman Wadsworth, one of the leading proponents of the Reorganization Act of 1946).

53. cf. Hopkins Federal Savings & Loan Ass'n v. Cleary, 1935, 296 U.S. 315, 334–335, 56 S.Ct. 235, 80 L.Ed. 251.

54. The statute, in its express terms, provides only that one summoned to produce

papers or give testimony who does not appear at all, and one summoned who appears, but "refuses to answer any question pertinent to the question under inquiry" shall be guilty of a misdemeanor—appearing to make no special provision for one who is summoned to produce papers and appears, but does not produce them. The Government having stated on oral argument that the requirement of pertinence probably applies to this latter situation, and that it would satisfy the burden of proving pertinence as though the requirement existed, without conceding as a general proposition that it does, [Trial Transcript pp. 17–18 (hereinafter referred to as "Tr.")] the Court has assumed *arguendo* that it does.

55. Watkins v. United States, supra note 37, 354 U.S. at pages 208–215, 77 S.Ct. at pages 1189–1193, 1 L.Ed.2d 1273.

56. Id., 354 U.S. at page 208, 77 S.Ct. at page 1190.

"the Due Process Clause requires in the expression of any element of a criminal offense." [57]

■ A. *The Explanation of Subject Matter*. The Court finds that the opening statement of the Chairman at the June 29 hearing on the return of the subpoena made indisputably clear the subject matter of the investigation. That statement said in its most relevant part:

"The port authority's operations affect the economic lives of millions of Americans living outside as well as inside the port development area and the States of New York and New Jersey. They intimately affect the operation of Federal agencies responsible, among other things, for the national defense, navigable waterways, and air, rail, and highway traffic. In short, they profoundly affect Federal interests of many and various kinds.

"Nevertheless, * * * neither the Judiciary Committee, to which is assigned responsibility for interstate compacts of this character, nor any other congressional committee, has ever conducted a general investigation of the Port of New York Authority to determine its conformance or nonconformance to the limits of its authority or the extent or adequacy of its performance of its responsibilities in the public interest.

"What is more, in recent months, complaints varying widely in character and gravity concerning the operations of the port authority under the compacts have come to the attention of the subcommittee. * * * [T]he staff of the House Judiciary Committee was directed last March to make a study of the activities and operations of the authority under the 1921 and 1922 compacts, including a review of the scope of the authority's major operations. * * *

"Notwithstanding [a request for certain files], the port authority failed for the most part to make available the documents requested. Rather, it limited itself to supplying documents virtually all of which were already matters of public record.

"Against this background, the subcommittee voted on June 8, 1960, to begin a full inquiry into the activities and operations of the Port of New York Authority under the 1921 and 1922 compacts. * * *

"Congress has responsibilities both under the compact clause of the Constitution and under the resolutions, with reservations thereto, by which it approved the compacts, the port authority, and the comprehensive plan.

"Congress also has responsibilities in many areas affected by the operations of the authority, such as, interstate commerce, the national defense, navigable waters, air, rail, and highway transportation, and the operation of Federal agencies, including independent agencies. * *

"It remains for the Chair to indicate the purpose and scope of the investigation in aid of which the subject subpenas were issued. The purpose of the investigation is to ascertain conformance or nonconformance of the Port of New York Authority with the congressionally imposed limitations on its powers and the extent and adequacy with which the authority is carrying out its duties and responsibilities under the congressionally approved compacts in order to determine whether Congress should legislate 'to alter, amend, or repeal,' its resolutions of approval.

"The need to reevaluate congressional consent to the 1921 and 1922 compacts arises in part from complaints which have come to the attention of the subcommittee concerning various of the port authority's activities and operations. To

57. Id., 354 U.S. at pages 209, 214–215, 77 S.Ct. at pages 1190, 1193.

give a few examples, it has been alleged that the policy of the port authority in combining revenues for financing purposes from all its facilities, rather than reducing tolls on each facility as it is amortized, placed an undue burden on the channels of interstate commerce and is contrary to national transportation policy—indeed, contrary to the publicly announced policy of the Bureau of Public Roads.

"It has been alleged that certain activities of the port authority unjustifiably discriminate against certain types of interstate carriers. It has been alleged that the port authority has extended its operations beyond the geographic limits contemplated by the Congress. It has been alleged that in the letting of certain service and construction contracts, the port authority has not permitted competition and has failed to grant the award to the lowest qualified bidder.

"It has also been asserted that the overall operations of the port authority have at no time been subjected to a comprehensive independent audit by any governmental agency.

"The subcommittee in its inquiry will study these and other matters to determine whether legislation is warranted with respect to congressional consent to the port authority compacts in order more adequately to protect and preserve the manifold Federal interests involved. The subcommittee deems access to the documents sought in the subpenas necessary to the effectuation of the investigation." [58]

Although isolated portions of this statement might, if taken out of context and subjected to close analysis in the comparative calm of a lawyer's office, suggest a somewhat narrower subject matter or yield ambiguities, the statement must be considered in its entirety as it was made to the defendant at the hearing. So read, its clear import is, in summary, that the subject under inquiry was twofold: (1) whether the Authority was operating functionally and geographically as envisioned by Congress when it approved the 1921 and 1922 compacts; and (2) whether it was carrying out the tasks given it pursuant to the compacts in a manner that showed sufficient concern for Federal interests. The ultimate purpose of the investigation was to determine whether legislation to alter, amend, or repeal the Congressional resolutions of consent to the compacts might be desirable in order to protect the Federal interests involved.

 B. *Pertinency.* On the trial of a contempt of Congress case, the Government must prove [59] as a matter of law and beyond a reasonable doubt, that the request for documents was pertinent to the subject matter under investigation.[60] The Government must also prove beyond

---

58. June 29 Tr. 2–5.

59. Bowers v. United States, 1953, 92 U.S. App.D.C. 79, 85, 202 F.2d 447, 453. Accord, Deutch v. United States, 81 S.Ct. 1587.

60. Braden v. United States, 1961, 365 U.S. 431, 435–437, 81 S.Ct. 584, 5 L.Ed.2d 653. The Government need not prove that every document requested would, if produced, have been material to the committee's inquiry. It need only show that the request was such that it might reasonably have been expected to elicit information which, under all the circumstances, could have been material. United States v. Orman, 3 Cir., 1953, 207 F.2d 148, 156.

And under the contempt of Congress statute it is the *request* which must be pertinent, Id., at pages 154, 156, and "[i]f it is principally pertinent it need not exclude every possible irrelevancy, at least until there is objection by the witness." United States v. Kamin, D.C. D.Mass.1956, 136 F.Supp. 791, 799–800, Aldrich, J. See also United States v. Kamin, D.C.D.Mass.1955, 135 F.Supp. 382, 389. In this case Mr. Tobin did not, either before or after the committee's explanation, make the kind of particularized objection to the pertinency of specific documents that would have called for a negation of possible irrelevancies.

a reasonable doubt[61] that the explanation of pertinency made to the witness at the hearing[62] was sufficiently clear to enable him to determine for himself whether the proper nexus existed between the request and the subject matter.[63]

The Court recognizes that in some cases there may be a fine line between the question of the sufficiency of a committee's explanation of pertinency and the question of actual pertinency in law; but in this case they may be treated as a single question. The Court finds that the Government has proved beyond a reasonable doubt that the explanation was sufficient, and the same analysis justifies a finding that the Government has proved beyond a reasonable doubt that there was legal pertinency.

Mr. Tobin's principal complaint regarding the explanation of pertinency is that it did not spell out in detail the "federal interest" which the Authority's operations may be adversely affecting, and the way in which the subpoenaed documents might reveal this fact.

The Court has already noted that the activities of the Port Authority obviously touch upon many areas of Federal concern. For example, the importance of these activities to the interstate and foreign commerce of the United States is so clear that in any discussion of the Authority it may be taken for granted.[64] The real question, then, is with what specificity the committee was required to identify the particular elements of those broad areas of Federal concern, and with what detail it was required to link the requested documents with these elements. In answering this question it is important to remember the nature of the committee's inquiry: although stimulated by specific complaints, it was to a

degree exploratory; for in the forty years of the Authority's existence, Congress had never undertaken to inform itself fully as to the inter-relation between Authority operations and the areas of responsibility committed to Congress by the Constitution. Because the stated subject matter of the inquiry was to determine whether and to what extent Federal interests were being affected, the committee performed its task of explaining pertinency by relating the subpoenaed documents to this subject. To say that it was required to delineate with ultimate precision the particular elements of Federal interests which the inquiry might reveal to be adversely affected would be to require the committee, in effect, to have stated its subject in the narrow terms of the conclusions it might later reach. This was obviously impossible.

Taking into account these factors, the Court finds that the Government has proved beyond a reasonable doubt that the committee's explanation of pertinency, which is set out as Appendix A hereto, clearly related the request for documents to the broad subject of inquiry. For example, the request for audits and financial statements was related to the questions whether any discriminations within or burdens upon interstate commerce resulted from Authority financial policies and whether the Authority was complying with the supervisory requirements imposed by various Federal agencies; the request for agenda and minutes of board meetings was related to the question whether policy formation within the Authority was consistent with Congressionally-approved objectives; the request for communications concerning public relations contracts was related to reported efforts by

---

61. Knowles v. United States, 1960, 108 U.S.App.D.C. 148, 151, 280 F.2d 696, 699.

62. This assumes that a proper objection was made on the grounds of pertinency. Barenblatt v. United States, supra, 360 U.S. at pages 123–125, 79 S.Ct. at pages 1091–1092.

63. Watkins v. United States, supra notes 55–57.

64. Indeed, by its contention that other House committees would have jurisdiction over some of the matters which were the subject of this inquiry, the Authority has, in effect, conceded this point.

the Authority to influence legislation and governmental decisions relating to matters of national concern.[65]

The Court does not believe it necessary to elaborate this conclusion by discussion of the committee's explanation in terms of each category of non-produced documents, but for purposes of illustration, examination of one category in this fashion will suffice.

The subpoena required, *inter alia,* that Mr. Tobin produce "all communications * * * relating to (a) the negotiation, execution and performance of construction contracts * * *." [66] The explanation given by the committee was that:

> "Construction contracts are important to the subcommittee because most construction undertaken by the authority is for facilities used in, or in the aid of, interstate commerce or national defense. The subcommittee desires to ascertain whether this construction satisfies Federal requirements, policies and responsibilities and whether other construction work by the authority affects or interferes with any Federal projects or construction policy.
>
> * * * * * *
>
> "Further, if in the negotiation or letting of * * * construction contracts clothed with Federal interests, practices are followed that prevent full competition or otherwise conflict with national policies, again, legislation modifying consent in these regards may become important." [67]

It cannot be a serious complaint that the explanation spoke of "contracts" while the subpoena called for production of "communications" relating to their negotiation, execution and performance. The words "construction contracts" should have been understood to refer not merely to the printed instruments alone, but to the complex of relations between the Authority and its contractors. Only with information as to how contracts came to be executed and how they were being performed could the committee make a rational judgment as to their effect on Federal interests. The explanation clearly relates the request to the subjects under inquiry: most Authority construction projects involve facilities, such as airports, bridges and tunnels, that have an important relationship to interstate commerce and national defense. As the explanation indicated, the committee also desired to know whether other Authority projects interfered with the construction of facilities that were matters of Federal concern. Although reference was made in general terms to "Federal requirements, policies and responsibilities," the Court does not think the committee, in explaining pertinency, was required to catalogue them in detail. For example, the Federal Government's ultimate responsibility for the adequacy of Authority facilities vital to the national defense is clear, and an elaboration of complex policies and requirements relating to defense facilities could not reasonably have been expected in these hearings.

Finally, the pertinency of contract negotiations to Federal antitrust policy was made evident in the second paragraph quoted above. The national economy and national policies regarding competition in the field of public contracts are, with-

---

65. It may be that the Authority did not have any "public relations contracts," but this fact would not vitiate the explanation of pertinency. "[T]he question is: was the question and the *possible* answer pertinent at that time to the [committee's] inquiry?" United States v. Orman, supra, 207 F.2d at page 154. It may also be true that not all public relations "policies and arrangements" related to the subject matter mentioned in the explanation, but the explanation demonstrated that such doc-
uments were "principally pertinent." See note 60 supra. No objection was made at the hearing to the possible irrelevancy of some of this material. These and the other principles set out in note 60 supra, and applied here, are equally applicable to the other alleged deficiencies in the explanation.

66. See request (4) (a) of the subpoena, supra note 7.

67. June 29 Tr. 50.

out doubt, influenced as greatly by actions of a large public contracting purchaser like the Authority, as by private contracting sellers like General Electric and Westinghouse whose internal operations have also been scrutinized by Congressional committees in connection with effectiveness of the antitrust laws.

### III. *The Committee's Legislative Purpose and Congress' Power to "Alter, Amend, or Repeal"*

The stated purpose of the committee's investigation was "to determine whether Congress should legislate 'to alter, amend, or repeal' its resolutions of approval." Defendant concedes that by virtue of the reservations in the consent resolutions Congress does have power to "alter, amend, or repeal" in order to protect *"existing* Federal interests." [68] Since the context of the committee's statement of purpose makes clear that any exercise of the power would be to preserve the integrity of Congress' approval of the compacts or to protect Federal interests that might be adversely affected by Authority operations, the question presented here is whether an inquiry of the scope announced can be justified as preliminary to a valid exercise of that power for this purpose.

An examination of the legislative history of the reservations, as well as interpretations of the Compact Clause itself, suggests the lengths to which Congress may go in exercising its power.

Floor discussion of the 1921 compact resolution in the House of Representatives included assent by Congressman Ansorge, the resolution's sponsor, to an assertion that

"the port of New York is an asset of the entire Nation * * * [and]

as the trustees of that asset, the people of New York and New Jersey owe it to themselves and to the country to properly develop it." [69]

He also stated that

"the joint resolution before the House fully protects the Federal Government by the [Federal jurisdiction reservation] * * *." [70]

This reservation was suggested by Treasury Secretary Andrew Mellon. [71]

In 1922 the same legislator, also sponsor of the second compact resolution, assured the House that the cities, states and nation are fully protected, [72] and noted:

"The cost of doing business at the port of New York is reflected throughout the entire country. The port of New York is not a local matter. It is distinctly national in scope and function." [73]

These statements indicate that the reservations were not included in the compacts as an automatic, purposeless gesture; rather they reflect Congressional and Executive awareness of the port of New York's unique status in the nation's commercial life, and appreciation that a compact providing for comprehensive development of the port was charged with Federal interests.

A further recognition of these facts appears in contemporaneous statements made by Julius Henry Cohen, the Authority's first counsel. [74] Their thrust is that since the comprehensive plan is "a regulation of interstate commerce * * * the port authority [is] the instrumentality in that sense of the Federal Government for the purpose of effectuating the * * * plan." [75]

---

68. Br. 87–88.

69. 61 Cong.Record 4920.

70. Id. 4921. See also id. 8589–8590 (remarks of Congressman Appleby).

71. S.Rep. No. 161, 67th Cong., 1st Sess. 1 (1921).

72. 62 Cong.Rec. 7975.

73. Id. 7976. See also id. 13750–13752 (remarks of Congressman Chandler).

74. Mr. Cohen had been one of the important moving figures in the negotiations leading to the Authority's creation.

75. June 29 Tr. 73 (brief in support of this investigation prepared by the committee, quoting this and other statements.)

The authoritative commentary on the compact clause, Frankfurter and Landis, "The Compact Clause of the Constitution—a Study in Interstate Adjustments,"[76] indicates that the clause was the blend of several objectives. Principally, it was intended to provide a non-litigious method for settlement of boundary disputes between States. It also provided authorization for other interstate "political adjustments,"[77] retaining to Congress the power to determine whether "the national, and not merely a regional interest may be involved," and to "exercise national supervision through its power to grant or withhold consent, or to grant it under appropriate conditions." As the authors summarized,

"The framers thus astutely created a mechanism of legal control over affairs that are projected beyond State lines and yet may not call for, nor be capable of, national treatment. They allowed interstate adjustments, but duly safeguarded the national interests."[78]

The cases which have interpreted the compact clause have confirmed these statements, and established that Congress has a two-fold duty: first, to prevent undue injury to the interests of non-compacting states;[79] second, to guard against interference with the "rightful management" by the National Government of the substantive matters placed by the Constitution under its control.[80] Where the subject of an agreement between states is "of merely local concern," Congress has no responsibility under the clause;[81] but as the Supreme Court emphasized as recently as 1959, the duty of Congress to protect substantive Federal interests such as interstate commerce and national defense in its actions under the compact clause is a clear one.[82]

In view of the frank recognition that the Port of New York is a "national asset" and that Congress has responsibility under the compact clause to "exercise national supervision" over compacts, it is clear to the Court that the power of Congress to legislate pursuant to the reservations must be co-extensive with any threat to national interests caused by activities of the Authority. It is not necessary and would be improper to speculate as to the type of legislation that might emerge from an inquiry such as this,[83] but the potential threats that might justify legislation have been suggested by the record before the Court. Improvident or excessive expenditures for the construction, operation or administration of facilities might result in tolls and charges that burden the flow of interstate commerce. Decisions relating to a particular mode of transportation may be taken without proper consideration of their impact upon national transportation policy. Planning and construction of facilities may be carried out without sufficient concern for the requirements of national defense. The Court does not intend to imply that these threats actually would appear; it is

---

76. 34 Yale L.J. 685 (1925).

77. Id. at 729.

78. Id. at 695.

79. See, e. g. State of Rhode Island v. Commonwealth of Massachusetts, 1838, 12 Pet. 657, 724–726, 9 L.Ed. 1233.

80. See, e. g. Wharton v. Wise, 1894, 153 U.S. 155, 169–170, 14 S.Ct. 783, 38 L. Ed. 669.

81. Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 289, 79 S.Ct. 785, 794, 3 L.Ed.2d 804 (Frankfurter, J., dissenting) ; State of Virginia v. State of Tennessee, 1893, 148 U.S. 503, 518, 13 S.Ct. 728, 37 L.Ed. 537.

82. Petty v. Tennessee-Missouri Bridge Commission, supra note 81, 359 U.S. at pages 282 note 7, 288–289, 79 S.Ct. at pages 790, 793–794 (dissenting opinion).

83. To so speculate as to the type of possible legislation and also to rule on its constitutionality without knowledge of its language and legislative history and the context in which court challenge to it would arise, would be, in effect, to render an advisory opinion, an exercise forbidden to the courts, by the Constitutional requirement that they decide cases and controversies.

sufficient, from the nature of the Authority and its operations and the type of complaints received by the Committee, that such threats might be uncovered.

There is no question that the inquiry proposed by the committee was broad in its scope, but the Court holds it was justified as groundwork for valid Congressional action in view of the substantial national interests which could have been found to be adversely affected by the Authority's operations.

The defendant raises several arguments in support of his contention that the committee had no valid legislative purpose.

First, he says that since any legislation must necessarily relate only to the Port of New York, the "port preference" clause of the Constitution would be violated. That clause provides:

"No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another * * *." [84]

There are several answers to this argument. The port preference clause has been given a narrow construction by the Supreme Court, and measures that benefit one port while only incidentally causing disadvantage to others have been said not to violate the clause.[85] In addition, it seems evident that the clause must be read to allow reasonable classifications among ports.[86] It cannot be supposed that there would be no rational justification for legislation relating solely to the nation's largest port. It is entirely possible, moreover, that legislation might result from the inquiry relating to the Authority as an operational agency rather than as a "port"—a requirement for periodic reports or audits, for example—and it seems clear that such action would not be an unconstitutional "preference" among ports.[87] Any significant objection on this ground must await specific legislation by Congress.

A second argument put forth by defendant is that there was no valid legislative purpose because the inquiry looked to legislation that would regulate the "internal administration" of the two States and the Authority in violation of the Tenth Amendment. There is no claim made that the reservation of power to alter, amend, or repeal the consent was itself unconstitutional, and it is evident to the Court that the reservation was a proper exercise of Congressional power under the compact clause. Further, the Court has held above that valid legislation pursuant to the reservation could emerge from the inquiry. In view of this there is no real substance to the Tenth Amendment argument. As the Supreme Court said this term,[88] quoting from James Madison:

"Interference with the power of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they might exercise it, although it should interfere with the laws, or even the Constitutions of the States."

---

84. Article I, § 9, clause 6.

85. Louisiana Public Service Commission v. Texas & New Orleans Railroad Co., 1931, 284 U.S. 125, 131–132, 52 S.Ct. 74, 76 L.Ed. 201.

86. Cf. Morey v. Doud, 1957, 354 U.S. 457, 465–469, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (applying the Equal Protection clause of the Fourteenth Amendment). The principles applied in this case and those it cites, also refute at this stage the contention that this investigation represents invidious discrimination against the States of New Jersey and New York. Cf. State of New York v. United States,

1946, 326 U.S. 572, 575–576, 66 S.Ct. 310, 90 L.Ed. 326.

87. The Court also notes that while the port preference clause speaks of preferences given "by Regulation of Commerce or Revenue," the legislation that would emanate from this inquiry would be an alteration, amendment, or repeal of the consent resolution. Such action would be taken pursuant to the reservations in the original resolutions, and not an enumerated power of Congress.

88. Reina v. United States, 1960, 364 U.S. 507, 512, 81 S.Ct. 260, 264, 5 L.Ed.2d 249.

Since the power here was "given," the contention that its exercise would unconstitutionally interfere with "internal administration" fails. The Court need not determine the scope of the power, for

> "the possibility that invalid as well as valid legislation might ensue from an inquiry does not limit the power of inquiry; invalid legislation might ensue from any inquiry." [89]

Finally, the defendant argues that the committee's stated purpose was not *in fact* its purpose, and that the true ends of the inquiry were not proper ones for a legislative committee. The real purposes, he alleges, were, in summary, exposure for exposure's sake, "punishment" of the Authority and its officials, and assumption of supervisory powers over the day-to-day operations of the Authority.

 The task of determining whether a committee was acting in pursuance of a proper legislative purpose is, in effect, a determination of whether it was acting constitutionally, and it is not a task lightly undertaken by the courts. It cannot be a search for motives of individual legislators; "[t]heir motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served."[90] Only when it cannot be established that "the primary purposes of the inquiry were in aid of legislative processes" can a court conclude that the inquiry was improper.[91]

 The Court finds on the record before it that the committee's true purposes were those stated. The propriety of these purposes was substantial; this was not a case where a committee's announced aims were themselves questionable or open to serious attack. The inquiry itself was, in effect, voted by the full House, and the subpoena was in fact voted by the full committee.[92]

In view of this, a holding that the purpose of the inquiry was invalid because of the motives of individual legislators would be to impute such motives to the entire House.

That the inquiry was sparked by the Authority's announcement that it favored construction of a jet airport in Morris County, New Jersey, is not sufficient to establish that the committee's purpose was to prevent the airport's construction. Dramatic incidents frequently stimulate far-ranging inquiries when it appears they may be symptoms of deeply rooted problems. Neither does the fact that the subpoena requested documents closely related to the Authority's day-by-day operations require a conclusion that the committee's purpose was to "regulate" these operations. To require information about the Authority is not to regulate the Authority,[93] and as the Court pointed out earlier, these documents were relevant to valid broader purposes.

### IV. *Privileges and Immunities Attaching to the Requested Documents.*

The Court must consider now whether, since Congress has the power to legislate regarding the compact resolutions, and since it would be aided in this task by studying the subpoenaed documents, it also has the power to order their production.

The Authority contends that the right to demand the documents does not auto-

89. Barsky v. United States, 1948, 83 U.S. App.D.C. 127, 131, 167 F.2d 241, 245, certiorari denied 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767.

90. Watkins v. United States, supra note 37, 354 U.S. at page 200, 77 S.Ct. at page 1186.

91. Barenblatt v. United States, supra note 38, 360 U.S. at page 133, 79 S.Ct. at page 1096, 3 L.Ed.2d 1115.

92. 106 Cong.Record 16064 (daily ed. August 23, 1960) (remarks of Congressman Celler).

93. See, e. g. Barsky v. United States, supra note 89, 83 U.S.App.D.C. at page 131, 167 F.2d at page 245.

matically follow from the existence of an area of legislative competence to which they have relevance. Where, as here, the documents are closely related to the operations of a non-federal agency which is principally the creation of two sovereign states, the doctrine of "executive privilege" reinforced by considerations of comity basic to the successful operation of our Federal system, it is argued, bars Congress from access.

The documents sought to be immunized may be divided into three categories: (a) communications to and from the Governors and their staffs; (b) those prepared and circulated solely among the Authority staff and commissioners; and (c) confidential reports to the Authority by outsiders.

At the outset the matter of the Governors' communications must be considered. Although they relate to the operations of the Authority, these documents are directly involved in the functioning of the office of the chief executive of a sovereign body in our dual form of government. Thus it is arguable that they occupy a uniquely privileged status. However, the Court need not here decide whether Congress has the power to require the production of these documents, since the defense of special gubernatorial privilege was never properly raised before the committee. At no time during the course of the inquiry—or, indeed, during the contempt proceeding in the

House—was Congress apprised that the committee's subpoena called for documents of this unique character.

Had Mr. Tobin so indicated to the committee, with anything approaching the particularity he has achieved in his presentation to this Court, the committee might then have determined, upon deliberation, whether to test its power in this area or to seek some mutually satisfactory resolution of the problem.[94]

Having failed to give the committee the opportunity to deal with the issue, Mr. Tobin may not properly assert it here; and the Court would be stretching the limits of its discretion to rule upon an issue neither properly raised nor necessary to decision which is of such potentially great Constitutional and political importance.

As to the other materials the Authority contends, first, that the documents in each of these categories are *absolutely* privileged from demand by Congress. In the alternative, it maintains that if the proper test is to balance Congress' need for them against injuries to this compact and to the Federal system that might ensue from disclosure, the balance is in favor of non-disclosure.

Preliminarily, the Court notes that it has been unable to find any clear authority relating to the right of *Federal* agencies and departments to withhold documents from Congressional scrutiny on the grounds of executive privilege.[95]

94. Cf. McPhaul v. United States, 1960, 364 U.S. 372, 378–379, 81 S.Ct. 138, 5 L.Ed.2d 136 the cases there cited, and United States v. Morton Salt Co., 1950, 338 U.S. 632, 653, 70 S.Ct. 357, 94 L. Ed. 401. Quinn v. United States, 1955, 349 U.S. 155, 162–165, 75 S.Ct. 668, 673, 99 L.Ed. 964, is distinguishable, principally on the ground that the objection there claimed to have been raised before the committee, the self-incrimination bar of the Fifth Amendment, was a familiar one in Congressional inquiries, so that the standard of what "a committee may reasonably be expected to understand as an attempt to invoke the privilege" could be a lower one.

Here knowledge that the subpoena called for Governors' communications

was uniquely the knowledge of those connected with the Authority, and they chose to attempt to gain immunity for all documents subpoenaed, rather than indicate to the committee their individual characteristics.

95. See Bishop, "The Executive's Right of Privacy: An Unresolved Constitutional Question," 66 Yale L.J. 477, 478 note 5 (1957).

By "clear authority" the Court means judicial decisions or unambiguous statements by the drafters of the Constitution. Unilateral declarations by the Executive, see, e. g. the memorandum by Attorney General Brownell, Id., or by Congress, see, e. g. Staff of Special Subcomm. on Legislative Oversight, House Comm. on Interstate and Foreign

Moreover, while the Supreme Court has upheld the power of a Congressionally-created commission to secure state voting records,[96] the scope of the doctrine of executive privilege as claimed by state agencies against Congress is not clear. The Port Authority, however, is a hybrid;[97] its very existence depended upon joint action by the States and Congress, and aspects of its continued operation remain subject to the legislative power of both. Thus, neither the doctrine of separation of powers nor considerations of federalism can alone be dispositive of the arguments here, and it is necessary to look to the analogous cases and to factors bearing upon the use of the compact device to determine whether and to what extent these documents may be immune from Congressional scrutiny either constitutionally or as a matter of public policy.

The instances are few where absolute immunities have been judicially created. They include the right of an individual to invoke the self-incrimination bar of the Fifth Amendment against the demands of a Congressional committee;[98] the right of litigants and witnesses in court proceedings to invoke the recognized common-law privileges;[99] the Federal Government's right, in civil proceedings in which it is a defendant, to withhold military secrets;[100] the right of members of the Federal Executive to be absolutely free from private suits for libel based on statements made in connection with "matters committed by law to [their] control and supervision;"[101] and the like privilege enjoyed by members of the judiciary.[102]

The thread that ties these cases together is the importance of preserving uninhibited freedom to communicate or not to communicate where certain relationships are present. It would be impossible to qualify this freedom in any one situation without seriously impairing it or destroying it altogether.[103]

However, in analogous situations where a conflict has been presented between asserted rights and privileges, often having Constitutional origins, courts have attempted to resolve the problem by balancing the interests in the particular case. This has been so, for example, where First Amendment rights have conflicted with the Congressional investigatory power;[104] where a criminal defendant's right to prepare his defense has clashed with the Government's interest in protecting the flow of infor-

Commerce, 85th Cong., 1st Sess., Right of Access by Special Subcommittee on Legislative Oversight to CAB Files and Records (Comm.Print 1957), are not such authority. See also 5 U.S.C.A. § 22.

96. Hannah v. Larche, 363 U.S. 420, 452, 80 S.Ct. 1502, 4 L.Ed.2d 1307, reversing on other grounds D.C.W.D.La.1959, 177 F.Supp. 816, 819–821. See also State of Alabama ex rel. Gallion v. Rogers, D.C.M.D.Ala.1960, 187 F.Supp. 848, 853–854, affirmed per curiam Dinkens v. Attorney General, 5 Cir., 1961, 285 F.2d 430; In re Wallace, D.C.M.D.Ala.1959, 170 F.Supp. 63, 67–68.

97. From time to time there has been argument as to whether the Port Authority is a "state" agency. Whatever value such conclusionary characterizations may have, it is clear that they must be limited to the context in which they are made, none having been made on Constitutional grounds. For purposes here relevant the Authority must be treated as a repository of both federal and state interests, *sui generis* in the federal system.

98. e. g. Quinn v. United States, supra note 94.

99. i. e. Husband-wife, lawyer-client, doctor-patient. Of course, in some jurisdictions, these privileges have been subject to statutory addition or modification.

100. e. g. United States v. Reynolds, 1953, 345 U.S. 1, 11, 73 S.Ct. 528, 97 L.Ed. 727.

101. Barr v. Matteo, 1959, 360 U.S. 564, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434.

102. e. g. Bradley v. Fisher, 1871, 13 Wall. 335, 20 L.Ed. 646.

103. Gregoire v. Biddle, 2 Cir., 1949, 177 F. 2d 579, 581.

104. e. g. Barenblatt v. United States, supra note 38.

mation from informants;[105] where a state's interest in maintaining an important activity has conflicted with the Federal power to tax;[106] and, significantly, where the interest of a defendant in a civil contempt case in preparing a full defense has conflicted with a Federal agency's asserted executive privilege for "internal" documents.[107]

The defendant argues, in contending for absolute immunity of compact authority documents, that permission for Congressional investigations into agency operations, even to the extent here contemplated, would "supersede the States in their control of the internal management and policies of their agencies,"[108] and would "destroy" compacts and severely inhibit states from entering into them. This would result, it is argued, because legislative scrutiny of agency internal documents would inevitably result in legislative dictation of agency decisions.

Furthermore, he says, with anything less than absolute immunity, administrative efficiency and the atmosphere of candor necessary to well-considered agency decisions would be destroyed; raw files containing unverified reports about innocent individuals might fall into the hands of publicity-seekers; and sources of confidential information necessary to agency functioning would be exposed or inhibited. In addition, it is argued, other sources of information exist from which the information can be secured.

In opposition to these arguments the Government contends that the Federal legislative function cannot be fettered by immunities attaching to non-Federal instrumentalities. The compact clause itself, it is argued, confers power to act in the national interest, and the power to investigate in furtherance of an exercise of this power cannot be defeated by asserted interests of lesser dimension.[109]

Neither of these arguments in its full thrust is persuasive. First, as the Court has already noted, the existence of a power to investigate does not, irrespective of the extent of that power, immutably lead to control by the investigating agency. Moreover, the fact that in several recent compacts the Federal Government has been included as a participant and that Congress has expressly reserved power to secure compact agency documents of the type here at issue strongly suggests that no serious inhibition to use of the compact device is presented. In two instances, the Tennessee River Basin Water Pollution Control Compact[110] and the Wabash Valley Compact,[111] provision is made for Presidential appointment of a "Federal representative." In two others, the New York-New Jersey Transportation Agency Compact[112] and the Washington Metropolitan Area Transit Regulation Compact,[113] Congress has reserved the right of "access to all books, records, and papers * * * as well as the right of inspection of any facility * * *." Moreover, the recently signed

---

105. Roviaro v. United States, 1957, 353 U.S. 53, 58–62, 77 S.Ct. 623, 1 L.Ed.2d 639.

106. e. g. State of New York v. United States, supra note 86, 326 U.S. at pages 586–590, 66 S.Ct. at pages 316–318, 90 L.Ed. 326 (concurring opinion of Stone, C. J.).

107. Olson Rug Co. v. N. L. R. B., 7 Cir., 1961, 291 F.2d 655. See also Kaiser Aluminum & Chemical Corp. v. United States, 1959, 157 F.Supp. 939, 141 Ct.Cl. 38, Reed, J. (semble). In addition, there are situations, exemplified by Jencks v. United States, 1957, 353 U.S. 657, 670–672, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and the cases there approved, in which the Government is given the choice

of declining to prosecute a man or revealing documents which otherwise might be covered by an "executive privilege," e. g. United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503, 505–506, whose thrust is to place below other Constitutional values the interest in secrecy of internal and informer communications engaged in by Federal agencies.

108. Br. 58–59.

109. Brief for the Government, p. 23.

110. 72 Stat. 823 (1958), § 3(a).

111. 73 Stat. 694 (1959), § 2.

112. 73 Stat. 575 (1959), § 2(e).

113. 74 Stat. 1031 (1960), § 7(c).

compact to develop the water resources of the Delaware River Basin includes the Federal Government as a full partner with the States of Delaware, New Jersey, New York and Pennsylvania.[114]

Finally, any impediment to the ideal effectiveness of compact agencies that might result from the denial of an absolute privilege cannot outweigh the impediment to Congress' ability to legislate effectively that would result from a grant of an absolute privilege.

■ On the other hand, the Court is not prepared to rule that in no situation can a privilege attach to documents of a compact agency. The Court believes that it is appropriate in this situation to establish a test which balances Congressional need for documents subpoenaed from compact agencies against the dangers to the particular compact involved and to the compact process in general which would result from the particular subpoena and investigation. If possible, attempt should be made to accommodate conflicting powers which overlap before it is decided that one must yield absolutely to the other. Honest and vigilant administration of the balancing test by the courts can accomplish this result. The Federal system is itself the product of accommodation between the need for central direction of affairs affecting the entire nation and the desire to prevent overcentralization; the compact clause is a more refined product of the same problem. In resolving the conflict between the interests, asserted in cases such as

this, accommodation is also the natural course.

The committee's need for the documents is based principally on these factors: since its inception over forty years ago, the Authority has not been the subject of any continuous public scrutiny, nor has any detailed investigation into its operations been made; oral testimony and documents already available to Congress cannot convey a complete picture of the Authority or provide adequate groundwork for potential legislation; the importance of the national interests that may be adversely affected requires that any action by Congress be based upon the fullest possible information and an attempt to act on anything less would subject Congress to a charge of arbitrariness.[114a]

The Authority's interests in nondisclosure have been stated above, but they may be summarized as a desire to preserve free communication to and among Authority personnel, and a fear that confidential information may be used for improper purposes.

■ The Court believes that on the facts of this case the balance must be struck in favor of disclosure. First, two factors indicate strongly that there is no overwhelming need to keep these particular documents secret.

In 1952, when Congress was presented with the resolution to withdraw consent from the compact resolutions until reservations could be added, Mr. Tobin offered

---

114. Interstate-Federal Compact for the Delaware River Basin, formally approved by the representatives of the compacting members on February 1, 1961, N.Y. Times, February 2, 1961, p. 1.

114a. The committee also urges the premise implicit in the Supreme Court's observation in McGrain v. Daugherty, 1927, 273 U.S. 135, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580, that "[e]xperience has taught * * * that information which is volunteered is not always accurate or complete * * *," and relies strongly, and in the Court's view validly, on the inferences to be drawn from the record, as to its need for the documents, from

two specific kinds of documents whose existence among those subpoenaed was revealed: i. e. the Authority's "assumptions" regarding the "profitability" of individual Authority facilities, Tr. 536, and communications revealing the way in which Authority decisions are made, which may indicate whether Federal interests are properly considered in making them: e. g. Nov.-Dec. Tr. 224–231 (memorandum "to file" from Mr. Tobin regarding conversations with Dwight Palmer, New Jersey Authority liaison representative concerning proposals that the Authority participate in commuter railroad equipment financing).

"to place at the disposal of your committee *whatever* records, information, data, or other material which may be helpful to your staff in preparation for the hearings on this resolution." [Emphasis added.][115]

Moreover, the executive privilege argument was not raised by the Authority when a committee of the New Jersey legislature recently inquired into its operations, and by defendant's own admission he was, in connection with this inquiry,

"producing every paper in the Port Authority that the Commission [sic] asks for. They are entitled to every scrap of paper and every memorandum and everything we have * * * [w]ithout exception." [116]

Defendant's attempts at trial to counteract the unfavorable implication of these statements was not convincing.

Second, the Court is confident that the committee will not needlessly reveal publicly Authority documents that would otherwise be confidential. That preservation of confidentiality wherever possible was, in fact the committee's purpose is indicated by its original offer to inspect and sift the documents at the Authority's New York headquarters. This purpose is further borne out by a statement made by a member of the full Judiciary Committee on the floor of the House during debate preceding the vote on the Committee's recommendation to cite Mr. Tobin for contempt:

"I, for one, fully realize that much of the material could and properly should be examined in executive session. Such a procedure would enable the committee to cull out the materi-

al from the immaterial. This procedure is frequently followed in judicial proceedings and as members of the Judiciary Committee, I am satisfied that such will be the course followed by the committee." [117]

These facts indicate to the Court that if the committee is given access to the documents, it will not reveal to the public, by leaks or otherwise, any which are not essential to its proper legislative purposes.[117a]

Third, the argument that enthusiasm for the compact device will be dampened if Congress is afforded access to documents such as these is not persuasive in view of the fact that the very states involved in this case have entered into another compact, in approving which Congress reserved the right to subpoena such documents.

It cannot be emphasized too strongly that the conclusion reached here is the result of a balancing of the unique facts of this case. In a future situation involving this agency or another, the factors will have to be weighed afresh, and clearly relevant will be the way in which the powers here recognized are exercised.

### V. *The Defense of Superior Order*

Mr. Tobin's final defense is that his noncompliance with the subpoena was ordered by the Governors in their letters to the Commissioners on June 25.

The purpose of the misdemeanor statute upon which this information rests is

"to facilitate the gathering of information deemed pertinent to the

---

115. 1952 Tr., supra note 20, at 346.

116. Tr. 527.

117. 106 Cong.Record 16009 (daily ed. August 23, 1960) (remarks of Congressman Willis).

117a. Another important indication that the committee was attempting to limit the range of documents requested and will limit the uses to which they are put—thus reducing the effects of their disclosure on internal Authority operations

—is the fact that the full Committee's original requests for personnel documents, June 29 Tr. 14, 15, were not included when the subpoena itself was issued. The Court concludes, as the Government conceded on trial, Tr. 776, that the subpoena as issued must be read as not calling for personnel records, even though such records might otherwise be included within one of the categories enumerated in the subpoena.

purpose of an investigating committee," [118]

by deterring those who consider obstructing such work and by punishing those who actually do.[119] The statute's requirement that the contempt be "wilful" is satisfied if "the refusal was deliberate and intentional and was not a mere inadvertence or an accident." [120] "No moral turpitude is involved;" [121] for example, wilfulness is not negatived by good faith reliance on the advice of counsel.[122] Of course, if the individual subpoenaed is not physically able to comply with the request, he cannot be convicted—unless he purposely caused the disability.[123]

It is a generally accepted doctrine in criminal law that orders of another are no legal defense to a charge of performing an act otherwise illegal, except where they carry a threat of physical retaliation.[124] However, with one significant exception,[125] orders from a superior have been held a defense in certain contempt of court proceedings involving subordinate Government employees.[126]

■■■ Thus, if the June 25 letters, when viewed in total context, (a) deprived Mr. Tobin, without his assistance or consent, of the physical ability to produce the documents, or (b) constituted a legally sufficient justification for his refusal to produce, or (c) caused his default to lack the statutorily required wilfulness, they would be a valid defense to this prosecution.

(a) The record makes it clear that the defense of physical inability to comply cannot be invoked, for the materials were not removed from Mr. Tobin's control. After the Governors' letters they remained exactly where they were, and Mr. Tobin retained access to them. This is borne out by his trial testimony that he has, without the Governors' consent, offered to produce for the New Jersey legislature all Authority documents.[127]

(b) Although no court has ever decided whether the order of a superior justifies a Government official in not complying with a Congressional mandate to produce information, a body of precedent does exist with regard to court orders. The relevant cases [128] reveal that refusals to comply, based upon the Federal Housekeeping statute [129] and regulations promulgated thereto, will generally be honored by the courts.

There are two principal policy motives which underlie this judicial attitude: (1) since requests for documents and information come from a great number of sources, it is desirable, in order to assure that consistent and responsible decisions are made, to centralize in one authority in each department the power to deter-

118. Fields v. United States, 1947, 82 U.S. App.D.C. 354, 357, 164 F.2d 97, 100, certiorari denied 1948, 332 U.S. 851, 68 S.Ct. 355, 92 L.Ed. 421.

119. United States v. Bryan, 1950, 339 U.S. 323, 329, 70 S.Ct. 724, 94 L.Ed. 884.

120. Fields v. United States, supra.

121. Braden v. United States, supra note 60, 365 U.S. at page 437, 81 S.Ct. at page 588, 5 L.Ed.2d 653; Licavoli v. United States, D.C.Cir., 1961, 294 F.2d 207.

122. Id.

123. United States v. Bryan, supra note 119, 339 U.S. at pages 330–331, 70 S.Ct. at page 730; cf. Societe Internationale, etc. v. Rogers, 1958, 357 U.S. 197, 208–209, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (dictum).

124. ALI, Model Penal Code (Tentative Draft No. 10) § 2.09, p. 7; Susnjar v. United States, 6 Cir., 1928, 27 F.2d 223, 224; State v. Western Union Telephone Co., 1953, 12 N.J. 468, 97 A.2d 480, 493, appeal dismissed 346 U.S. 869, 74 S.Ct. 124, 98 L.Ed. 379.

125. Sawyer v. Dollar, 1951, 89 U.S.App. D.C. 38, 190 F.2d 623, vacated as moot, 1952, 344 U.S. 806, 73 S.Ct. 7, 97 L.Ed. 628.

126. E. g. United States ex rel. Touhy v. Ragen, 1951, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417; Boske v. Comingore, 1900, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846; Appeal of United States S. E. C., 6 Cir., 1955, 226 F.2d 501.

127. Tr. 527.

128. Supra note 126.

129. 5 U.S.C.A. § 22.

mine whether to honor such requests,[130] and (2) it is necessary, in order to avoid inhibiting those who furnish information to the Government, to insure that such information will not be released except by officials of high rank, in whose discretion informants presumably would have greater confidence.[131] However, where neither policy is operative, and where the sole purpose of the superior's directive is to resist the order to produce, the superior's mandate will not constitute justification.[132]

The Court is of the view that this case is controlled by the reasoning implicit in Sawyer v. Dollar,[133] and that the policies operative in the Housekeeping Statute cases are not present here. The purpose of the Governors' letters, by their own language, was not to centralize determinations about release of Authority documents; such power was already centralized in Mr. Tobin. Nor was it to preserve the continued flow of outside confidential communications to the Authority; the defense of privilege of the subpoenaed documents could have been and, indeed, was forcefully asserted before the committee by Mr. Tobin, the custodian of the documents, who reflected the attitude of all connected with the Authority. Rather, the letters' objective was either to compel the committee to confer with the Governors before the inquiry proceeded, or to insure default on the subpoena to precipitate a court test of the committee's power to demand the subpoenaed material.[134] As such, it could not constitute a justification for Mr. Tobin's refusal to produce the documents.

(c) Mr. Tobin also seeks to establish by the letters that his conduct lacked the wilfulness required by the statute. As phrased by the amicus brief filed in this case by New York and New Jersey

"[i]t runs contrary to our system of justice to allow a person to be held criminally liable when he has acted in accordance with orders from his superiors and his oath of office." [135]

This is so, it is argued, principally because if Mr. Tobin disregarded the directive, the Governors would then dismiss him from office or veto the Commissioners' action renewing his contract; while if he disobeyed the subpoena and it were upheld, he would be found guilty of a Federal crime and would face the possibility of a jail term. The Court, it is contended, should construe the statutory requirement of wilfulness to avoid such a result.

Had the record only contained Mr. Tobin's statement at the return of the subpoena that he had recommended nondisclosure to the two Governors, the Court might conclude that he acted only within the scope of his proper duties as the Governors' advisor, and thus the construction contended for might be permissible. However, from a study of the entire record, the Court is satisfied that the Governors' letters were the product of efforts to justify Mr. Tobin's continuous position of noncompliance. His role was thus more than that of an advisor, and the letters were a ratification of his position rather than a command to assume that position. When the letters are thus viewed, the Court concludes, refusal to obey the subpoena was wilful within the meaning of the statute.

These factual conclusions are justified by Mr. Tobin's own statements and by documents presented to the committee and to the Court. He testified on trial that from the time he received the first letter from the Judiciary Committee

130. United States ex rel. Touhy v. Ragen, supra note 126, 340 U.S. at page 468, 71 S.Ct. at page 419.

131. Boske v. Comingore, supra note 126, 177 U.S. at pages 469–470, 20 S.Ct. at pages 705–706.

132. Sawyer v. Dollar, supra note 125, 89 U.S.App.D.C. at pages 46–55, 190 F.2d at pages 631–640.

133. Id. cf. United States v. United Mine Workers, 1947, 330 U.S. 258, 293–294, 67 S.Ct. 677, 91 L.Ed. 884.

134. Supra note 30.

135. p. 59.

Chairman in March, 1960, he had thought "it would be a grave mistake for the two States to permit this sort of investigation * * *." [136] The import of the remainder of his testimony is that he encouraged, assisted, and concurred in a letter sent to the two Governors on March 18, 1960, over the signatures of the Authority Chairman and Vice-Chairman, the last sentence of which stated:

> "We will not grant them [the committee] access to internal administrative material or the day-to-day working files of the various departments of the Port Authority until we receive your authorization to do so." [137]

Further, Mr. Tobin testified that he participated in many meetings between the Authority staff and Commissioners and the Governors, which were held not to discuss whether there ought to be production of the Authority documents, because all agreed that there should not be, but to resolve "differences * * * as to procedure * * * the two Governors should take." [138]

Just as one summoned by a Congressional committee cannot destroy subpoenaed documents and then claim that his failure to produce them was not wilful, one cannot take a position of noncompliance, play a major role in procuring a directive to confirm that attitude, and then argue that he has been so deprived of free choice that his actual failure to comply was not wilful. It is no argument that had Mr. Tobin wanted to comply, the Governors still might have issued a contrary directive; the statute focuses on his conduct, not theirs, and it is enough that had his attitude been one of compliance, the directive might not have issued. [139]

## VI. *Conclusion*

It is regrettable that the differences between two members of our governmental family should have ripened into litigation such as this. Hostile lawsuits, like wars between nations, are a poor substitute for effective diplomacy where interacting governmental units are concerned. Conflicts of power are, of course, inevitable in our federal system, with its built-in fragmentation of power centers, but the greater the chance of conflict, the greater the need for statesmanship on the part of those who head the various units.

The fact that the Court decides that Congress has the *power* to request the documents here subpoenaed and to investigate this compact agency is neither carte blanche to excessive use of that power nor an excuse for failure by the committee to re-examine the relative necessity and desirability of some of its requests and the manner in which it conducts its hearings. As the Court has previously indicated, one of the controlling factors in this case is that this is the first full probe into the Port Authority ever conducted by Congress.

Finally, the Court must comment on the way in which it was necessary for Mr. Tobin and the Authority to challenge, in good faith, Congress' right to subpoena these documents: to stand in contempt and be liable for criminal prosecution. During the House debate on the contempt citation, the Committee inserted in the *Congressional Record* a memor-

---

136. Tr. 437.

137. Defendant's Exhibit No. 3a.

138. Tr. 438.

139. Cf. United States v. Fleischman, 1950, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906, Societe Internationale etc. v. Rogers, supra note 123, 357 U.S. at page 205, 78 S.Ct. at page 1092.

Because the facts here presented reveal that the Governors' letter, which theoretically faced Mr. Tobin with a conflict between two orders, was the product of his own efforts and a ratification of his own attitude, the Court need not and does not decide whether noncompliance with a Congressional subpoena would be wilful where a subordinate was instructed by a superior's directive, unsolicited by him, to defy it. Nor does the Court decide whether sanctions could be applied to the superior who retaliates when the Congressional mandate is obeyed.

andum purporting to show that declaratory judgment procedures were not an available means for procuring judicial resolution of the basic issues in dispute in this case.[140] Although this question is not before the Court, it does feel that if contempt is, indeed, the only existing method, Congress should consider creating a method of allowing these issues to be settled by declaratory judgment. Even though it may be constitutional to put a man to guessing how a court will rule on difficult questions like those raised in good faith in this suit,[140a] what is constitutional is not necessarily most desirable. Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights. Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interest of two sovereigns.

Upon a finding of guilty of the offense charged against the defendant the statute requires a sentence of a fine of not more than $1,000 nor less than $100, and imprisonment for not less than one month nor more than twelve months. The defendant, therefore is sentenced to a fine of $100 and thirty days in jail. However, because defendant has stipulated his willingness to turn over the documents to the committee in the event of a finding of guilty, the sentence[141] will be stayed for a period of thirty days, and in the event of compliance with the subpoena, will then be suspended.

Assuming a review and affirmance of this conviction, the sentence will be further stayed until thirty days after the mandate of the appellate court has been filed.

## APPENDIX A

Statement entitled "The Documents Required by the Subpoenas as Modified by the Letters are Pertinent to the Authorized Purpose of this Investigation," authorized by Subcommittee number 5 to be read at the June 29, 1960 hearing, and read at that time by Committee Chief Counsel [H.Rep. 2117, 86th Cong., 2d Sess. (Report Citing Austin J. Tobin) pp. 48–52]:

Questions have been raised as to the pertinence to the subcommittee's inquiry of the documents required by the subpenas served upon these witnesses. With respect to those questions, the Chair wishes to make the following statement:

In the judgment of the subcommittee, the pertinence to the stated purpose of the subcommittee's inquiry of each of the categories of documents required by the subpenas served upon these witnesses on June 15, 1960, is clear on the face of the subpenas.

Virtually all these documents were first requested from the port authority in March of this year. Since then, other letters have been sent to the executive director of the port authority setting forth generally the scope of the inquiry, particularizing the requests, and making clear that the subcommittee will consider production of all documents described in these subpenas dating from January 1, 1946, to June 15, 1960, to be full compliance with the subpenas.

Thus, the port authority, its officers and employees, including these three witnesses, have had ample opportunity to study these requests and ascertain their pertinence.

While in the view of the subcommittee further explanation is not necessary, nevertheless, to avoid any possible question and in order to make abundantly clear

140. 106 Cong.Record 16089–16094 (daily ed. August 23, 1960).

140a. Watkins v. United States, supra, note 37, 354 U.S. at page 208, 77 S.Ct. at page 1190, 1 L.Ed.2d 1273. No court has, however, passed on the constitutionality of the contempt statute from this view-

point, and it was not argued in this case. But cf. Comment, 11 Stanford L.Rev. 164 (1958); Note, 47 Colum.L.Rev. 416, 428–430 (1947).

141. By "sentence," the Court means the fine and the jail term.

to these witnesses wherein the documents requested by the subcommittee are pertinent to the subcommittee's inquiry, the Chair will explain briefly some of the reasons for requesting each of the categories of documents listed in the subpenas.

As the Chair pointed out in his opening statement, the purpose of this inquiry is "to ascertain conformance or nonconformance of the Port of New York Authority with the congressionally imposed limitations on its powers and the extent and adequacy with which the authority is carrying out its duties and responsibilities under the congressionally approved compacts in order to determine whether Congress should legislate 'to alter, amend or repeal' its resolutions of approval."

The documents listed in the subpenas are sought to aid the subcommittee in performing this legislative purpose. Each category of documents was considered by the subcommittee and was concluded to be necessary and pertinent to the accomplishment of this purpose.

1. Item (1) of the subpenas calls for production of "all by-laws, organization manuals, rules and regulations" of the port authority.

These documents are needed to apprise the subcommittee of the scope and extent of the port authority's activities in order that the subcommittee may ascertain whether or not the authority is adhering to the duties, responsibilities and limitations placed upon it by Congress in the enabling resolutions of 1921 and 1922.

A thorough knowledge of the port authority's structure, lines of authority, and its rules and regulations governing the activities of its officers and employees is needed so that the subcommittee may fully comprehend the scope of the authority's operations.

Furthermore, article XVIII of the 1921 compact, approved by the Congress in Public Resolution No. 17 of the 67th Congress, authorizes the port authority to make suitable rules and regulations "not inconsistent with the Constitution of the United States" and "subject to the exercise of the power of Congress for the improvement and conduct of navigation and commerce."

Manifestly, the subcommittee must examine, among other things, all rules, regulations, and manuals promulgated by the authority to find out whether they are in conformity with the limitations expressed in that article.

2. Item (2) of the subpenas calls for production of "annual financial reports; internal financial reports, including budgetary analyses, post-closing trial balances, and internal audits; and management and financial reports prepared by outside consultants."

These materials, in addition to the port authority's annual two-page summaries of financial condition, are required by the subcommittee so that it may learn with particularity the extent and scope of the port authority's operations and activities with respect to specific undertakings.

It is therefore necessary for the subcommittee to find out how much of the authority's revenues are derived from, and how much of its expenditures go toward carrying out, each of its various projects.

Such information is essential to determine whether or not certain channels of interstate commerce in the port district are being discriminated against, or unduly burdened by, the policies—including financial policies—of the authority.

In addition, it has been alleged that the policy of the port authority in combining revenues for financing purposes from all its facilities, rather than reducing tolls on each facility as it is amortized, places an undue burden on the channels of interstate commerce and is contrary to national transportation policy.

The subcommittee needs the information specified in this item in considering the advisability of legislation conditioning congressional consent to the compacts upon agreement to modify existing policies of the authority.

Moreover, some of the receipts and expenditures of the port authority are, under the terms of the interstate compacts and under Federal law, subject to the scrutiny of various Federal agencies.

For example, the Department of the Navy, the U. S. Army Engineer Corps, the Federal Aviation Agency, the General Services Administration and the General Accounting Office, among others, all have legal responsibilities over some of the authority's activities and finances.

Accordingly, it will be necessary for the subcommittee to examine all audits and internal financial data of the authority to determine the manner and extent to which the port authority has complied with the supervisory requirements imposed by the Federal agencies with responsibility for various port authority activities under the interstate compacts and to determine whether or not congressional consent should be conditioned upon added safeguards.

3. Item (3) of the subpenas calls for all "agenda and minutes of meetings of the board of commissioners and of its committees; all reports to the commissioners by members of the executive staff."

These documents are pertinent to the inquiry to enable the subcommittee to learn what policies have been adopted by the board, the manner and extent to which those policies have been carried out by the authority personnel and staff, and how those policies conform to obligations and limitations imposed by the congressionally-approved compacts.

This will permit a thoroughgoing review of the scope and extent of the activities and operations of the port authority at the top levels. It will also enable the subcommittee to determine whether or not policy formation and execution by the authority is consistent with congressionally-approved objectives.

The agenda and the reports of the staff are also required in order to afford a full view of the authority's activities and operations. For example, failure of the authority to follow staff recommendations with respect to any Federal interest affected by the authority's operations might frame issues significant in the subcommittee's assessment of those operations.

Item 4(a) of the subcommittee's subpenas calls for all files relating to "negotiation, execution and performance of construction contracts; negotiation, execution and performance of insurance contracts, policies and arrangements; and negotiation, execution and performance of public relations contracts, policies and arrangements."

This request was made because those three categories of authority activities represent areas having direct impact upon Federal interests.

Construction contracts are important to the subcommittee because most construction undertaken by the authority is for facilities used in, or in the aid of, interstate commerce or national defense. The subcommittee desires to ascertain whether this construction satisfies Federal requirements, policies and responsibilities and whether other construction work by the authority affects or interferes with any Federal projects or construction policy.

Insurance contracts are necessary to the inquiry, in part, because of the huge risks involved in the day-to-day operation of authority facilities and the potential liability of the port authority with respect to important national defense instrumentalities and with respect to the movement of persons and goods in interstate commerce.

In the event of any casualty for which the authority is liable, the possible indemnity could reach hundreds of millions of dollars, as was the case, for example, in the Texas City disaster. Should the files show that insurance coverage has not been adequate to protect fully all of the Federal interests affected by the port authority, modification of the interstate compacts may be necessary.

Further, if in the negotiation or letting of insurance or construction contracts clothed with Federal interests, practices

are followed that prevent full competition or otherwise conflict with national policies, again, legislation modifying consent in these regards may become important.

Public relations contracts are needed for similar reasons and for the additional reason that such contracts can be, and according to reports brought to the subcommittee's attention, have been used for the purpose of affecting legislation and other governmental decisions on a variety of subjects, including diversion of interstate and foreign commerce from certain United States ports to the port of New York.

Such activities of the port authority are of manifest significance to the Congress because the very purpose of the constitutional requirement of congressional consent is to safeguard the interests of the many States from the combined efforts of those acting under a compact.

Item 4(b) of the subcommittee's subpenas calls for all records relating to "the acquisition, transfer and leasing of real estate."

These documents are sought by the subcommittee, in part, because of its concern over certain real estate practices of the port authority as reported in various allegations coming to the subcommittee's attention. The subcommittee's duty to ascertain whether amending legislation to the consent resolutions of 1921 and 1922 is necessary with respect to these matters, makes it essential for it to examine these files.

In this connection, the subcommittee wishes to consider, for example, whether real estate acquisitions, transfers and leases by the port authority outside the specified geographical limits of the port district as contemplated by Congress should be further limited by modifying legislation. It also wishes to consider, as an additional example, whether the acquisition transfer and leasing of real estate by the port authority for industrial development and similar commercial purposes not related to the initially approved

purpose of coordinating transportation should be curtailed or regulated.

These legislative aims require that the subcommittee have full knowledge of current and past practices and policies of the port authority with respect to all real estate transactions.

Item 4(c) of the subcommittee's subpenas requires the production of files relating to "the negotiation and issuance of revenue bonds."

These documents are sought, in part, because it has been alleged that full and free competition is not permitted by the authority in underwriting arrangements for issuance of its bonds.

In addition, it appears that issuance of these bonds is not subject to regulation by the Securities and Exchange Commission. The effectiveness with which the port authority conducts these financing operations bears directly upon its ability to carry out its responsibilities under the compacts.

Accordingly, it is essential that the subcommittee scrutinize these files in considering whether to condition further consent to the compacts upon changes in financial policies of the authority.

Item 4(d) of the subcommittee's subpenas calls for files relating to "the policies of the authority with respect to the development of rail transportation."

These documents have been requested because of the subcommittee's desire to ascertain the extent to which one of the authority's principal purposes has been carried out. In article 6 of the 1921 compact as approved by Congress, certain primary powers granted under the compact are conditioned upon approval of a comprehensive plan for the development of the port.

In 1922, this comprehensive plan was presented to the Congress and approved. The 1922 comprehensive plan dealt extensively with development of rail transportation into and out of the port district. Accordingly, examination of files dealing with policies concerning the development of rail transportation are necessary to give the subcommittee informa-

tion as to how this part of the authority's mandate as approved by Congress in 1922 has been and is being carried out.

The foregoing explanation, the Chair wishes to emphasize, illustrates only some of the respects in which the documents required by its subpenas are necessary to the effectuation of the subcommittee's inquiry.

The Chair has made the forgoing statement to make clear to all concerned that the selection of documents required by the subpenas is reasonably calculated to aid the subcommittee in carrying out the duties and responsibilities imposed upon it by its parent Committee on the Judiciary and by the U. S. House of Representatives. However, the foregoing in no way exhausts the reasons why the documents called for by the subpenas are pertinent and necessary to the subcommittee's inquiry.